781 A.2d 787

Jody Lee MILES

v.

STATE of Maryland.

No. 42, Sept. Term, 1998.

Court of Appeals of Maryland.

Sept. 18, 2001.

492

494

498

Nancy S. Forster, Asst. Public Defender (Stephen E. Harris, Public Defender, Arthur A. DeLano, Jr. and Elisa A. Long, Asst. Public Defenders, on brief), Baltimore, for appellant.

Annabelle L. Lisc, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for appellee.

Argued Before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BATTAGLIA, Judge.

On April 2, 1997, appellant Jody Lee Miles shot and killed Edward Atkinson during a robbery. Appellant was tried by a jury in the Circuit Court for Queen Anne's County from March 9 through March 12, 1998, after the case was removed from the Circuit Court for Wicomico County, and convicted of felony homicide, robbery with a deadly weapon, robbery and use of a handgun in the commission of a crime of violence. A sentencing hearing was conducted on March 17–18, 1998. Appellant was sentenced to death on March 19, 1998. This case is before this Court on automatic appeal pursuant to Maryland Code, Art. 27, § 414 (1957, 1996 Repl.Vol., 1999 Supp.) and Maryland Rule 8–306(c). We find no errors that tainted the proceedings. Accordingly, we affirm appellant's convictions and the sentence of death.

## I. FACTS

On April 2, 1997, Edward Joseph Atkinson was shopping at the Structure Store and Small's Formal Wear located at a mall in Salisbury, Maryland. While arranging to pick up tuxedos at Small's for a musical theater production he was

directing, he received a page. Atkinson immediately left the mall. Later that day, at approximately 5:30 p.m., Harry Hughes, Jr., a resident of Old Bradley Road in Mardela Springs, Maryland, saw Atkinson driving a black Toyota Camry down Old Bradley Road. Within fifteen minutes, Hughes heard a single gunshot.

On the same day, Atkinson failed to show up for dinner at his home with his parents and for his evening play rehearsal. His mother, Dorothy Atkinson, notified the Maryland State Police that her son was missing. The next day, April 3, 1997, at approximately 9:00 p.m., Maryland State Police officers located Atkinson's Toyota near Old Bradley Road and found a cowboy boot print in the area.

In the morning of April 4, 1997, Robert Wayne Atkinson, the victim's brother, and his friend who had joined the search, Sean Thomas Mooney, returned to Old Bradley Road to comb the area for additional information concerning Edward Atkinson's whereabouts. After following footprints on the ground, Robert Wayne Atkinson discovered his brother's body in a wooded area. Later that same day, Robert Wayne Atkinson and Sean Mooney also saw a gray colored car driven by the appellant heading towards the crime scene off of Old Bradley Road. The police arrived on the scene and determined that Edward Atkinson had been shot once in the back of the head and dragged to the location where his body was found. The police noticed several additional cowboy boot prints near the body matching the one found the night before by the victim's car, as well as scuff marks indicating a struggle at the side of the road. The police also discovered that Atkinson's pockets had been emptied, but a search of the wooded area surrounding the crime scene failed to produce the victim's wallet and keys.

In contacting his brother's credit card companies to report the theft, Robert Wayne Atkinson learned that the cards had been used after his brother had been reported missing. The cards had been used on April 3, 1997, at a Wal Mart ATM in Cambridge, Maryland, at the Tru Blu gas station in Harring-

ton, Delaware, at the Structure and J.C. Penney stores in the Dover Mall, and at Shuckers Pier 13 Restaurant in Dover, Delaware. The personnel interviewed at these locations described the credit card holder as a white male, approximately 6'1" to 6'3" tall, having medium length dirty blonde to brown hair, and wearing white jeans or pants with a white shirt and cowboy boots. (Two of the Tru Blu gas station attendants subsequently identified appellant as the Atkinson card user.) Composite sketches of the suspect were drawn and circulated on local news stations. During the next two weeks, news reports specifically mentioned the sighting of the murder suspect at the Tru Blu gas station.

On April 15, 1997, James Towers (a resident of Caroline County) was in his home monitoring the police and fire department radio transmissions with his scanner. Towers' scanner was capable of picking up cellular phone conversations. At some point between 8:30 and 9:30 p.m., Towers overheard a conversation on his scanner where a male and female discussed the importance of staying away from the Tru Blu gas station in Harrington, Delaware. Because he thought this conversation might be related to the news story about the murder, Towers tape-recorded the conversation. Towers notified the Maryland State Police about the tape, who promptly picked up the tape from Towers' residence.

The tape of the phone conversation included a discussion of concealing evidence, as well as descriptions of the geographic area surrounding the couple's home. Deputy Ronald Russum of the Caroline County Sheriff's Department listened to the tape and identified the female voice as Jona Miles, who turned out to be appellant's wife. Detective James Fraley of the Delaware State Police identified the voices as Jody and Jona Miles, based on his previous contacts with both individuals.

By April 22, 1997, after locating Jona Miles's residence, the Maryland and Delaware State Police applied for search warrants for 292 Cole Britt Lane, Harrington, Delaware and 27880 Whiteleysburg Road, Greensboro, Maryland, properties owned by Jona Miles and her parents. The police executed

the warrants on the same day. During the search of the properties, the police seized several items of clothing belonging to appellant and his 1996 W–2 tax statement as well as other papers, a razor, telephone bills, phone numbers from a caller identification box, and other pieces of note paper.

Later that day, the police placed Jona Miles under arrest and questioned her at the Caroline County Sheriff's Department. Jona Miles gave a statement to the police and assisted them in ascertaining her husband's whereabouts. She also signed a consent to search form authorizing Corporal Fisher of the Maryland State Police Force to search her trailer located on her parents' property at 27880 Whiteleysburg Road. Pursuant to the consent to search form, the police seized one pair of black men's jeans and one pair of tan Structure dress pants.

Jona Miles admitted that within a week after April 2, 1997, she had thrown two Structure shirts in a dumpster near Route 404 in Centreville, Maryland, and a few days later she had accompanied her husband as he disposed of his cowboy boots in a dumpster behind a shopping center in Milford, Delaware. Ms. Miles also dumped a handgun, holster and ammunition left by her husband in the Choptank River near Denton, Maryland. With the assistance of Ms. Miles, the State Police were able to recover the gun in its holster and the ammunition, but were not able to find the clothing. As a result of information given to them by Jona Miles, the police arrested appellant while he was driving a gray Chevrolet Cavalier on Carmichael Road near a farm where he had been working. The contents of the car, including a cellular phone and the vehicle registration card, were inventoried and seized.

During the evening of April 22, 1997, Corporal William V. Benton and Trooper John Psota began interviewing appellant, after he was advised of his *Miranda* rights. Within minutes of the beginning of the questioning, appellant admitted that on April 2, 1997, he met Edward Atkinson at a rest area near Old Bradley Road. Appellant claimed that he had been sent by a loan shark to collect a package from Atkinson, which the

victim did not produce. He stated that he became scared when Atkinson, who, at appellant's direction, had his back to appellant the entire time, reached inside his jacket. Appellant, concerned that Atkinson had a gun, fired one shot striking the victim in the back of the head.[1] Afterwards, appellant found and removed Atkinson's wallet and two briefcases from the car. Although appellant returned to the scene on April 4, 1997 with the intention of burying Atkinson's body, he fled when he saw all of the police cars in the area.

On May 9, 1997, appellant was indicted and charged with felonious homicide, robbery with a deadly weapon, robbery, first-degree assault, and use of a handgun in a crime of violence in Wicomico County. On July 29, 1997, the state filed a notice of its intention to seek a sentence of death pursuant to Maryland Code, Art. 27, § 412(b). On October 2, 1997, the case was transferred for trial to the Circuit Court for Queen Anne's County. The trial court heard pre-trial suppression motions pursuant to Rule 4–452 on January 28, 1998 and February 23–24, 1998, wherein appellant sought to suppress the contents of the taped cellular phone conversation with his wife, the items seized pursuant to the search warrant executed in the early afternoon of April 22, 1997, the items seized pursuant to Jona Miles's consent to search, the gun and its accessories, appellant's confession, and his cellular telephone seized pursuant to a post-arrest inventory of his vehicle.

Based on these motions, the trial court ruled to suppress the taped cellular phone conversation as well as evidence seized pursuant to a search warrant where the affidavit of probable cause made explicit reference to the facts contained in the cellular phone conversation as a violation of the Maryland Wiretapping Statute, Maryland Code, Section 10–401 et seq. of the Courts and Judicial Proceedings Article (1977, 1998 Repl.Vol., 2000 Supp.). The trial court refused to suppress

---

1. The report of the medical examiner and his subsequent testimony at trial, however, concluded that based on gun powder residue found in the soft tissue of the wound, Mr. Atkinson died from a contact gun shot wound.

the remaining evidence, reasoning that the language "evidence derived therefrom" as contained in the statutory exclusionary provision of the Maryland Wiretapping Act did not include evidence provided by Jona or Jody Miles. On March 12, 1998, the jury entered a guilty verdict for first-degree felony murder, robbery with a deadly weapon, robbery and use of a handgun in the commission of a crime of violence. Appellant was acquitted on the charge of first-degree premeditated murder. Shortly after midnight on March 19, 1998, the jury sentenced appellant to death. The trial court merged the robbery conviction into the armed robbery count and imposed a five-year concurrent sentence for the handgun count. Appellant filed a Motion for New Sentencing and/or Imposition of Life Sentence in Lieu of Death Sentence on March 26, 1998. The trial court held a hearing on this motion on May 7, 1998. The motion was denied on July 7, 2000.

## II. ISSUES

On appeal, appellant urges reversal on the following eight grounds:

I. Did the trial court err in denying, in part, appellant's motion to suppress pursuant to the Maryland Wiretapping Act, Maryland Code, § 10–401 et seq. of the Courts & Judicial Proceedings Article?

II. Did the trial court err in failing to fully disclose the contents of a jury note sent to the judge after seven hours of sentencing deliberations?

III. When, after seven hours of deliberations, the jury asked the trial court what to do if they were not unanimous, is it improper for the trial court to instruct the jury that unanimity is an absolute prerequisite and fail to instruct the jury that it could report its lack of unanimity?

IV. Did the trial court improperly limit what the jury could consider as mitigating evidence under section 8(b) of the sentencing form in the instructions provided to the jury?

V. Did the trial court err in refusing to instruct the jury during sentencing that it must find, as a non-statutory mitigating circumstance, that appellant was acquitted of premeditated murder?

VI. Were there ambiguities and inconsistencies present in the sentencing verdicts which would require that appellant's death sentence be vacated?

VII. Did the trial court err in excusing four jurors for cause?

VIII. Did the trial court abuse its discretion in refusing to grant defense counsel's motion for mistrial when it was discovered that the jurors had seen appellant in shackles?

Facts relevant to each issue are set forth as necessary in our consideration of the issues below.

## III. SUPPRESSION OF EVIDENCE UNDER THE MARYLAND WIRETAPPING ACT

A motions hearing was conducted on January 28, 1998, in the Circuit Court for Queen Anne's County. As pertains to the issues on appeal before this Court, the motions hearing before the trial court involved the suppression of evidence obtained as a result of the Maryland State Police having secured and used a recording made by a private citizen of a cellular phone conversation between Jona and Jody Miles on April 15, 1997.[2] Appellant argued that the Maryland Wiretap Statute protects all phone conversations, cellular or otherwise. *See* Maryland Code, § 10–401, et seq., of the Courts & Judicial Proceedings Article (1977, 1998 Repl.Vol., 2000 Supp.). Furthermore, appellant argued that evidence obtained in violation of Section 10–402 must be excluded from evidence at trial. Appellant also argued for the suppression of evidence seized pursuant to search warrants executed at Jona Miles's home,

---

2. At the suppression hearing and at all subsequent proceedings the parties have referred to the telephone used by appellant, Jody Miles, as a cellular telephone. Jona Miles used a land-line telephone in her home.

from appellant's car following his arrest, as well as suppression of the gun, ammunition and holster recovered by the Maryland State Police in the Choptank River and the statements given to police by both Jona and Jody Miles as evidence derived from the unlawful interception of the cellular phone conversation.

At the suppression hearing, the trial court heard testimony from James Towers, the private citizen who taped the cellular phone conversation between Jona and Jody Miles and turned the recording over to the Maryland State Police. Towers testified that he had purchased his Radio Shack scanner several years prior to the recording of the conversation between the appellant and Jona Miles. The scanner in question was commercially available in Radio Shack stores and could monitor up to four hundred channels. Towers explained that he took his scanner to the now defunct Kent Communications in Dover, Delaware, for alterations to enhance its functioning. Towers testified that his scanner could pick up transmissions from cellular phones, cordless phones, emergency services such as police, fire and ambulance communications, and radio stations. Prior to April 15, 1997, Towers had never recorded a transmission received by his scanner and turned it over to the police.

Because the affidavits of probable cause used to obtain search warrants for Jona Miles's property contained explicit references to the taped conversation, the trial court suppressed the contents of the phone conversation as well as all items seized pursuant to the search warrants. The trial court permitted the State to introduce the evidence to which Jona Miles led the police, namely the .22 caliber gun and its accessories, as well as the confession of appellant, Jody Miles. Appellant argues that this evidence should have been suppressed because of its connection to the wiretapped conversation. We disagree, based upon the attenuation doctrine and its application to this case.

In 1977, the Maryland General Assembly enacted the Wiretapping and Electronic Surveillance Act (the Maryland Act),

codified at Section 10–401 et seq. of the Courts & Judicial Proceedings Article of the Maryland Code. The Maryland Act makes the following conduct unlawful:

(1) Wilfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

(2) Wilfully disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle; or

(3) Wilfully use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle.

Maryland Code, § 10–402(a) of the Courts and Judicial Proceedings Article (1977, 1998 Repl.Vol., 2000 Supp.). *See Derry v. State,* 358 Md. 325, 342–43, 748 A.2d 478, 487–88 (2000); *State v. Mazzone,* 336 Md. 379, 382, 648 A.2d 978, 979 (1994); *Mustafa v. State,* 323 Md. 65, 69, 591 A.2d 481, 483 (1991); *Ricks v. State,* 312 Md. 11, 15–16, 537 A.2d 612, 614, *cert. denied,* 488 U.S. 832, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988).

The model for the Maryland Wiretapping Act was Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–2521 (2000) (the Federal Act). The Federal Act was designed to balance the protection of an individual's privacy with the enforcement of criminal laws. *See United States v. Kahn,* 415 U.S. 143, 151, 94 S.Ct. 977, 982, 39 L.Ed.2d 225, 234 (1974); *Ricks v. State,* 312 Md. at 13, 537 A.2d at 613. The Federal Act sets forth minimum national standards prohibiting both law enforcement officials and private individuals from intercepting and using the contents of oral and wire communications, while allowing law enforcement officials following specific procedures and under specific circumstances concerning the investigation of criminal offenses to obtain a court order to

intercept wire and oral communications related to the commission of a crime.[3]

The Maryland Wiretapping Act provides broader protection than Title III in that Maryland requires consent from all parties before a conversation may be taped or otherwise intercepted in the absence of a court order authorizing law enforcement officials to conduct a wiretap. *See Wood v. State,* 290 Md. 579, 583, 431 A.2d 93, 95 (1981); *see e.g.,* Richard Gilbert, *A Diagnosis, Dissection, and Prognosis of Maryland's New Wiretap and Electronic Surveillance Law,* 8 U. Balt. L.Rev. 183, 221 (1979)(explaining that "as written [the Maryland Act] guarantees to the people of Maryland, insofar as the state, itself, is concerned, greater protection from surreptitious eavesdropping and wiretapping than that afforded the people by the Congress"). At the times relevant here, the Maryland Wiretapping Act applied so long as at least one party to the conversation was physically located within the State of Maryland during the phone call.[4] *See Mustafa,* 323

---

3. The Federal Act defines " 'wire communication' " as "any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station) furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce and such term includes any electronic storage of such communication." 18 U.S.C. § 2510(1). " 'Oral communication' means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication." 18 U.S.C. § 2510(2). " 'Intercept' means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4)(1970, 2000 Repl.Vol.).

4. The General Assembly recently enacted Chapter 370 of the 2001 Maryland Laws, which eliminates the former language of subsection (b) of Section 10–405 of the Wiretapping Act, and inserts new language stating:

If any wire or oral communication is intercepted in any state or any political subdivision of a state, the United States or any territory, protectorate, or possession of the United States, including the District

Md. at 70, 591 A.2d at 483 (applying the Maryland Wiretapping Act to the taping of a conversation by one party to the conversation who was located in the District of Columbia and speaking with a person located in Maryland). Therefore, people using telephones in Maryland "may ordinarily rely on the fact that their conversation will *not* be surreptitiously recorded or, at the very least, that, unless done in strict conformance with the State law, a recording of their conversation will not be admitted into evidence in any Maryland court." *See Perry v. State,* 357 Md. 37, 61, 741 A.2d 1162, 1175 (1999)(emphasis in original).

Although the Maryland Wiretapping Statute is grounded, to some extent, in Fourth Amendment jurisprudence, it contains its own exclusionary provision in Section 10–405 to deter law enforcement officials from unlawful or unauthorized interception of wire and oral communications. This section provides as follows:

Whenever any wire or oral communication has been intercepted, no part of the contents of the communication and no

---

of Columbia in accordance with the law of that jurisdiction, but that would be in violation of this subtitle if the interception was made in this state, the contents of the communication and evidence derived from the communication may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of this state, or any political subdivision of this state if:

(1) At least one of the parties to the communication was outside the state during the communication;

(2) The interception was not made as part of or in furtherance of an investigation conducted by or on behalf of law enforcement officials of this state; and

(3) All parties to the communication were co-conspirators in a crime of violence as defined in Article 27, § 643B of the Code.

The new legislation also includes a provision in Section 10–407(c)(2) which would allow an individual who receives information concerning an intercepted wire, oral, or electronic communication under the same criteria listed in the new Section 10–405(b) to "disclose the contents of the communication or the derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of this state ...". These amendments to the Maryland Wiretapping Act will take effect on October 1, 2001.

evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of this State, or a political subdivision thereof if the disclosure of that information would be in violation of this subtitle.

Maryland Code, § 10–405 of the Courts and Judicial Proceedings Article (1977, 1998 Repl.Vol.). The exclusionary rule of Section 10–405 mirrors the language of the Federal Act's exclusionary provision, as both provisions contain prohibitions against the use of not only the unlawfully intercepted communication, but also the "evidence derived therefrom." [5]

■ We now consider the application of the Maryland Wiretapping Act and its internal exclusionary provision to the facts of this case. On April 15, 1997, appellant called home to his wife, Jona Miles, from a cellular phone in his car.[6] The conversation taped by Mr. Towers emanates from this call. The issue of whether a cellular phone call is protected under the Maryland Wiretapping Statute is a matter of first impression. The Maryland Act defines a "wire communication" as "any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of a connection in a switching station) furnished or operated by any person licensed to engage in providing or operating such facilities for the transmission of communications." § 10–

---

**5.** 18 U.S.C. § 2515 provides as follows:

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter." (1970, 2000 Repl.Vol.).

**6.** At the pre-trial motions hearing, in their briefs before this Court, and at oral argument the parties have referred to the communication device used by appellant as a cellular telephone.

401(1)(i). The transmission of a cellular phone communication to an ordinary telephone line involves the sound waves of the conversation being transmitted over the cellular phone company's designated frequency to the cellular phone carrier's transmitter, which sends the signal over a land-based wire to the ordinary telephone. *See generally* RAYMOND C.V. MACARIO, CELLULAR RADIO-PRINCIPLES AND DESIGN, (2nd ed.1997). The use of the cellular phone company's transmitter as a switching station for converting the communication to a land-based telephone line places cellular phone technology within the definition of a "wire communication" under Section 10–401(1)(i).[7] Furthermore, the Maryland Wiretapping Act specifically provides for the imposition of fines to punish persons who intercept cellular phone conversations. *See* § 10–402(e). The relevant portion states as follows:

> " . . . [A] person who violates subsection (d) of this section is subject to a fine of not more than $10,000 or imprisonment for not more than 5 years, or both.
>
> (2) If an offense is a first offense under paragraph (1) of this subsection and is not for a tortious or illegal purpose or for purposes of direct or indirect commercial advantage or private commercial gain, and the wire or electronic communication with respect to which the offense occurred is a radio communication that is not scrambled or encrypted, and:...(ii) The communication is the radio portion of a cellular telephone communication, a public land mobile radio service communication, or a paging service communication, the offender is subject to a fine of not more than $500."

***

**7.** With regard to the use of the term "switching stations" in the Federal Act, the Senate has stated that it "makes it clear that cellular communications-whether they are between two cellular telephones or between a cellular telephone and a 'land line telephone'—are included in the definition of 'wire communications' and are covered by the statute." *See* FISHMAN AND MCKENNA, WIRETAPPING AND EAVESDROPPING, § 2:13 (2nd ed.1995)(quoting Senate Rpt. No. 99–541 at 11, reprinted in 1986 U.S.Code, Cong. & Admin. News 3555, 3565)(internal quotations omitted).

Code, § 10–402(e) of the Courts and Judicial Proceedings Article.[8]

Because we have determined that cellular phone communications with land phones are protected under the Maryland Wiretapping Act, we must address the existence and extent of any violations of the statute by the Maryland State Police requiring exclusion of the taped cellular phone conversation and any "evidence derived therefrom." *See* § 10–405. Although Mr. Towers testified at the suppression hearing that he did not know that it was unlawful for him to tape the cellular phone conversation between appellant and his wife, we have held that an intentional interception of such a communication violates the Maryland Wiretapping Act. *See Deibler v. State,* 365 Md. 185, 199, 776 A.2d 657, 665 (2001)(holding that "an interception that is not otherwise specifically authorized is done willfully if it is done intentionally—purposely"). What is clear from Mr. Towers's testimony at the pre-trial suppression hearing is that he believed the conversation was related to the news story of the murder of Edward Atkinson he had heard previously that day and that the police might be interested in acquiring the information. Although the police were not involved in the initial listening to or the taping of the conversation, the police were aware that the conversation had been taped by Mr. Towers without the consent of the parties to the conversation. This Court discussed the interplay of the statutory exclusionary rule with the other provisions of the subtitle in *Perry,* wherein we stated:

> To determine whether the disclosure of an intercepted communication is in violation of the subtitle [for purposes of the exclusionary rule of § 10–405], it is necessary to look at § 10–402(a)(2) and § 10–407. The former makes it unlawful

---

**8.** In *Bartnicki v. Vopper,* 532 U.S. 514, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001), the United States Supreme Court specifically recognized that the Federal Wiretapping Act applies to cover the interception of conversations taking place on cellular and cordless telephones. *Id.* at ——, 121 S.Ct. at 1759, 149 L.Ed.2d at 799; *see also Nix v. O'Malley,* 160 F.3d 343, 348 (6th Cir.1998) and *McKamey v. Roach,* 55 F.3d 1236, 1240–41 (6th Cir.1995).

for any person to "wilfully disclose" to any other person the contents of a wire communication "knowing or having reason to know that the information was obtained through the interception of a wire...communication in violation of this subtitle." Section 10–407(c), however, provides, in relevant part, that any person who has received, "by any means authorized by this subtitle," any information concerning a wire communication "intercepted in accordance with the provisions of this subtitle," may disclose the contents of that communication, or the derivative evidence, while giving testimony in court under oath or affirmation.

357 Md. at 63, 741 A.2d at 1176. In the instant case, the Maryland State Police did not receive the tape or have authorization to play the tape. Because the actions of the Maryland State Police were not authorized by the statute, we need not determine the willfulness of the police in disclosing the information contained within the tape under Section 10–402(a)(2), for as we have noted, "[w]hether the interception was done willfully or non-willfully, the violation of the person's right to privacy was the same." *Perry*, 357 Md. at 66, 741 A.2d at 1178.

The Maryland State Police used the tape of the cellular phone conversation between Jona and Jody Miles for two investigatory purposes in violation of Section 10–405, as they used the tape for voice recognition and to provide facts to set forth in the affidavit for probable cause to search property belonging to Jona Miles and her parents. With regard to the issue of voice recognition, the State asserts that use of the tape to provide voice recognition as an investigative tool does not violate the Fourth Amendment. We agree with the State's argument that under a Fourth Amendment analysis there can be no privacy expectation in one's voice. *See United States v. Dionisio*, 410 U.S. 1, 14, 93 S.Ct. 764, 771, 35 L.Ed.2d 67, 79 (1973)(noting that "the physical characteristics of a person's voice, its tone and manner, as opposed to the content of a specific conversation, are constantly exposed to the public"). Nevertheless, a person's voice is part and parcel of the contents of the conversation. The Maryland Wiretapping Act

provides broader protection than the Fourth Amendment in that it makes it unlawful to "wilfully use, or endeavor to use, the *contents* of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle." Maryland Code, § 10–402(a)(3) of the Courts and Judicial Proceedings Article (emphasis added). Thus, the parties' voices in the conversation would be protected under the statute. *See Perry*, 357 Md. at 70, 741 A.2d 1162, 1180 (1999)(holding that the tape itself and testimony identifying the voices on a tape recording of phone conversation made in violation of Section 10–402 is inadmissible under Section 10–405).

In the instant case, the Maryland State Police disclosed the contents of the tape to two police officers. Deputy Ronald Russum of the Caroline County Sheriff's Department listened to the tape of the cellular phone conversation and was able to identify the female caller as Jona Miles based on his previous contact with her. Detective James Fraley of the Delaware State Police identified the male caller as appellant, Jody Miles, and the female caller as Jona Miles based on voice identification from prior contact with both individuals and from facts discussed in the conversation which disclosed the relative geographic location of the female caller. Thus, the police, as an "authority of this State," violated Section 10–405 by using the contents of the communication when they listened to the tape to engage in voice identification of Jona and Jody Miles. Therefore, we agree with the trial court's decision to suppress the taped cellular phone conversation and any reference thereto from use at trial under Section 10–405.[9]

---

9. In addition to the protections of the Maryland Wiretapping Statute, the taped cellular phone conversation between Jona and Jody Miles would have to be suppressed as privileged marital communications. This Court noted that, "[c]ommunications between husband and wife occurring during the marriage are deemed confidential if expressly made so, or if the subject is such that the communicating spouse would probably desire that the matter be kept secret, either because its disclosure would be embarrassing or for some other reason." *Coleman*

Subsequent to the voice identification of Jona and Jody Miles by the police, Detective Fraley and Detective Alfred Parton of the Delaware State Police prepared an affidavit and application for a search warrant for the property belonging to Jona Miles and her parents. In establishing probable cause in the warrant application, Detective Fraley and Detective Parton made explicit reference to the facts contained in the taped cellular phone conversation, as well as disclosing to the Delaware magistrate that the facts were ascertained through listening to a tape made by a private citizen who intercepted the cellular phone call on his scanner. The search warrant was approved by a Delaware Justice of the Peace and executed on April 22, 1997 at 2:15 p.m., during which the police seized over twenty-four items belonging to appellant. We conclude that, because the contents of the cellular phone conversation were disclosed in the affidavit of probable cause to obtain a search warrant for Jona Miles's property in violation of Section 10–405, all evidence seized pursuant to execution of this warrant was properly suppressed at trial.[10]

---

*v. State*, 281 Md. 538, 542, 380 A.2d 49, 52 (1977). The privilege remains intact even when the marital communication involves criminal activity. *See id.* at 545, 380 A.2d at 54. The legislature intended to preserve the marital privilege regardless of whether a communication was intercepted by an eavesdropper or by law enforcement officials pursuant to a court order. *See* Maryland Code, § 9–105 of the Courts & Judicial Proceedings Article (1977, 1998 Repl.Vol., 2000 Supp.) (providing that "one spouse is not competent to disclose any confidential communication between the spouses occurring during their marriage"). *See also, Mazzone*, 336 Md. at 389–90, 648 A.2d at 983. Thus, while Jona Miles would not have been incompetent to testify as to the matters discussed in the taped cellular phone conversation, appellant, by virtue of the privilege contained in § 9–105 could have successfully precluded such testimony by his wife. *See Brown v. State*, 359 Md. 180, 183, 753 A.2d 84, 85–86 (2000).

**10.** At the motions hearing on January 28, 1998, appellant raised the issue that the marital privilege would bar the testimony of Mr. Towers had he been called to testify at trial concerning the facts he learned from listening to the telephone conversation between Jona and Jody Miles, referring to this Court's decision in *Mazzone*, 336 Md. 379, 648 A.2d 978. We need not reach this issue as the trial court pursuant to the Maryland Wiretapping Act, Section 10–405, properly suppressed the contents of the conversation.

■ We must now consider the scope and application of the statutory exclusionary rule set forth in Section 10–405 with regard to the interpretation of the language "evidence derived therefrom" as we consider whether the trial judge erred in allowing the evidence obtained from leads provided by Jona Miles, including appellant's black jeans and tan dress pants, and the murder weapon and its accessories to be introduced in evidence at trial. For purposes of analyzing the phrase "evidence derived therefrom," we note that the primary illegality was the interception of the cellular phone call by James Towers on April 15, 1997. *See Deibler,* 365 Md. at 199, 776 A.2d at 665. Appellant argues that the language "evidence derived therefrom" requires the exclusion of all evidence obtained after listening to the tape, based on the belief that were it not for the violation of the wiretapping statute in listening to the unlawfully intercepted tape, the police would not have discovered the identities of Jona and Jody Miles resulting in both parties arrests, confessions, and additional production of evidence. The State argues the same principles underlying the exclusionary rule of *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), apply to the interpretation of the language "no evidence derived therefrom" under the statutory exclusionary rule based on the fact that the statutory exclusionary rule is a preventive or deterrent device, such that rulings regarding the exclusion of evidence under Section 10–405 must be narrow enough to accomplish the deterrence goals without sacrificing valid investigatory evidence and material attenuated from taint.

■ When considering the scope of a piece of legislation, this Court has stated, "the legislative intent of a statute primarily reveals itself, through its very own words." *Derry,* 358 Md. at 335, 748 A.2d at 483. If the statutory language "is plain and free from ambiguity, and expresses a definite and simple meaning," there is no need to look elsewhere to discern legislative intent. *See Degren v. State,* 352 Md. 400, 417, 722 A.2d 887, 895 (1999). However, this Court has frequently noted:

While the language of the statute is the primary source for determining legislative intention, the plain meaning rule of construction is not absolute; rather, the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body. The Court will look at the larger context, including the legislative purpose, within which statutory language appears. Construction of a statute which is unreasonable, illogical, unjust, or inconsistent with common sense should be avoided.

*Tracey v. Tracey*, 328 Md. 380, 387, 614 A.2d 590, 594 (1992) (citations omitted).

Prior to enactment of the current Maryland Wiretapping Act, this Court considered the scope of the exclusionary provision of the Federal Act as set forth in 18 U.S.C. § 2515. *See Carter v. State*, 274 Md. 411, 423–24, 337 A.2d 415, 422–23 (1975). Following our decision in *State v. Siegel*, 266 Md. 256, 272, 292 A.2d 86, 95 (1972), where this Court had concluded that wiretapping cases must be considered under whichever statute was more constricting, we examined the facts of *Carter* under the Federal Act which was more-restrictive than the 1956 Maryland Wiretapping Act. *See Carter*, 274 Md. at 426, 337 A.2d at 424. In *Carter*, the police had used illegal electronic surveillance in investigating the drug activities of the defendant, included the facts ascertained through the unlawful surveillance in an affidavit for probable cause to obtain a search and seizure warrant for defendant's apartment, and failed to disclose to the issuing judge the fact that the information contained in the warrant was the product of an unauthorized wiretap in violation of the Maryland and Federal Wiretapping Acts. *Id.* at 419–20, 337 A.2d at 420. We found:

The weight of authority in the state courts is in accord with the view that evidence derived as a result of a prior illegal search for, or seizure of, property, or knowledge gained through such an illegal search and seizure, cannot be used, because of its taint, as a valid basis to justify the existence of probable cause in a subsequent search and seizure war-

rant. *See* Annot., 143 A.L.R. 135–140 (1943); Annot., 50 A.L.R.2d 531, 569 (1956).

Thus, if any conversation of Carter or any conversation overheard upon his premises-whether he was present and participating in it or not-was subjected to a search and seizure by the use of any wire tap or eavesdropping device, in violation of his rights under the Fourth Amendment, as explicated in *Alderman v. United States, supra,* in *Silverman v. United States, supra,*[ 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)] and *Katz v. United States, supra,*[ 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)] any information garnered as "fruits" of such primary illegality and "come upon" by the "exploitation" of that illegality cannot, under the holdings in *Silverthorne Lumber Co. v United States, supra, Nardone v. United States, supra, Wong Sun v. United States, supra,* and *Alderman v. United States, supra,* be used as derivative evidence for an application for a search and seizure warrant; to hold otherwise would permit the prosecution to use knowledge acquired in violation of the Fourth Amendment and "gained by its own wrong." The doctrine of the "fruit of the poisonous tree" although it excludes evidence obtained from or as a consequence of lawless official acts does not apply however if such evidence is "obtained from an independent source," or such "connection may have become so attenuated as to dissipate the taint."

*Id.* at 438–39, 337 A.2d at 431. Thus, we applied a Fourth Amendment exclusionary rule analysis to use of evidence derived from an unlawful wiretap in holding that in cases where an affidavit of probable cause to issue a search warrant contained facts tainted by the illegal conduct of the police in the unlawful interception of telephonic communications, an evidentiary hearing must be conducted to determine whether the facts were the fruits of the poisonous tree or whether the taint had been purged by discovery of the facts through an independent source or attenuated from the original unlawful conduct. *See Carter,* 274 Md. at 443, 337 A.2d at 434 (citing *United States v. United States District Court,* 407 U.S. 297, 92

S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Nardone v. United States,* 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937); *People v. Mendez,* 28 A.D.2d 727, 281 N.Y.S.2d 608 (2d Dept., 1967)); *see also Washburn v. State,* 19 Md.App. 187, 201–202, 310 A.2d 176, 184 (1973).

In adopting the Federal Act, Congress did not intend to alter or circumvent the attenuation doctrine in adopting a statutory exclusionary rule. *See United States v. Giordano,* 416 U.S. 505, 528–29, 94 S.Ct. 1820, 1833, 40 L.Ed.2d 341, 360–61 (1974). In *Giordano,* the Supreme Court emphasized the relevance of the attenuation doctrine to the exclusionary provision of the Federal Act by citing a portion of S.Rep. No. 1097, 90th Cong., 2d Sess. at 96, 106 (1968) which specifically noted that:

"Section 2515 of the new chapter imposes an evidentiary sanction to compel compliance with the other prohibitions of the chapter. ... The provision must, of course, be read in light of section 2518(10)(a) discussed below, which defines the class entitled to make a motion to suppress. It largely reflects existing law. It applies to suppress evidence directly (*Nardone v. United States,* 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937)) or indirectly obtained in violation of the chapter. (*Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939).) *There is, however, no intention to change the attenuation rule. ... Nor generally to press the scope of the suppression role beyond present search and seizure law.* ... But it does apply across the board in both Federal and State proceeding[s].... And it is not limited to criminal proceedings. Such a suppression rule is necessary and proper to protect privacy. ... The provision thus forms an integral part of the system of limitations designed to protect privacy. Along with the criminal and civil remedies, it should serve to guarantee that the standards of the new chapter will sharply curtail the unlawful interception of wire and oral communications."

*Giordano, supra,* 416 U.S. at 529–30, n. 17, 94 S.Ct. at 1833, n. 17, 40 L.Ed.2d at 360–61, n. 17 (emphasis added).

The United States Court of Appeals for the Fourth Circuit has adopted the procedure of having a "taint hearing" regarding evidence resulting from a wiretap violation wherein the claimant has the initial burden of establishing a taint and the government may demonstrate that the taint was purged. *See United States v. Apple,* 915 F.2d 899, 906 (4th Cir.1990). Thus, not all evidence obtained following an unlawful wiretap must be suppressed under the federal statutory exclusionary rule.

 Therefore, we find that the scope and meaning of the words "no evidence derived therefrom" as used in the statutory exclusionary rule of the Maryland Wiretapping Act are best analyzed under the attenuation doctrine arising out of cases concerning unlawful searches and seizures under the Fourth Amendment. *See Ferguson v. State,* 301 Md. 542, 548, 483 A.2d 1255, 1257–58 (1984)(discussing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). Under the "fruit of the poisonous tree" doctrine, evidence tainted by Fourth Amendment violations may not be used directly or indirectly against the accused. *See Nardone,* 308 U.S. at 341, 60 S.Ct. at 268, 84 L.Ed. at 312. However, there must be a "cause-and-effect" relationship or nexus between the "poisonous tree and its alleged fruit," so as to prevent "an indiscriminate lapse into the logical flaw of *post hoc; ergo, propter hoc* (after this; therefore, because of this)." *State v. Klingenstein,* 92 Md.App. 325, 360, 608 A.2d 792, 810 (1992), *cert. granted,* 328 Md. 462, 615 A.2d 262 (1992), *aff'd in part, rev'd in part,* 330 Md. 402, 624 A.2d 532 (1993), *cert. denied,* 510 U.S. 918, 114 S.Ct. 312, 126 L.Ed.2d 259 (1993)(internal quotations omitted).

 In balancing the protections of the Fourth Amendment with the need for effective law enforcement, the Supreme Court has recognized three methods of purging the taint of the original unlawful conduct in cases where the exclusionary rule applies. First, evidence obtained after initial unlawful governmental activity will be purged of its taint if it was inevitable that the police would have discovered the

evidence. *See Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377, 387 (1984). Second, the taint will be purged upon a showing that the evidence was derived from an independent source. *See United States v. Wade,* 388 U.S. 218, 239–242, 87 S.Ct. 1926, 1938–1940, 18 L.Ed.2d 1149, 1164–1166 (1967). The third exception, and the one relevant to the case *sub judice,* will allow the use of evidence where it can be shown that the so-called poison of the unlawful governmental conduct is so attenuated from the evidence as to purge any taint resulting from said conduct. *See Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455.

In *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Supreme Court analyzed the application of the attenuation doctrine "at the crossroads of the Fourth and Fifth Amendments." *Id.* at 591, 95 S.Ct. at 2256, 45 L.Ed.2d at 420. We adopted the test for attenuation, as set forth in *Brown,* in *Ferguson v. State,* 301 Md. at 549, 483 A.2d at 1258 (considering the application of the attenuation doctrine to extrajudicial and in-court identification testimony given by the victim of a robbery, where the accused was arrested without probable cause).

In *Brown,* the Supreme Court developed a three factor test for analyzing whether statements given in custody after the accused waives his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), must be excluded as fruits of an unlawful arrest where the accused was arrested without probable cause. *See Brown,* 422 U.S. at 591–92, 95 S.Ct. at 2256, 45 L.Ed.2d at 420. In discussing the purpose of the exclusionary rule the Court stated:

> The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it. *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). But despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons. *United*

*States v. Calandra,* 414 U.S.[ 338] at 348, 94 S.Ct. 613, 38 L.Ed.2d 561[ 1974].

*Id.* at 599–600, 95 S.Ct. at 2260, 45 L.Ed.2d at 425 (internal quotations omitted). The Court found that although receipt of *Miranda* warnings alone is not *per se* dispositive of the issue of attenuation, it is an important factor in assessing the voluntariness of a confession. *See id.* at 603, 95 S.Ct. at 2261, 45 L.Ed.2d at 427. The Court held that an analysis of attenuation also requires consideration of the following factors: 1) the proximity between the actual illegality and the evidence sought to be suppressed; 2) the presence of intervening factors; and 3) the flagrancy of the governmental misconduct involved in the case. *See id.* at 603–604, 95 S.Ct. at 2261–2262, 45 L.Ed.2d at 427.

In *Brown,* two police officers who had been investigating a recent murder, arrested the defendant without probable cause for the purpose of questioning him about the murder. *Id.* at 592, 95 S.Ct. at 2256, 45 L.Ed.2d at 420. To accomplish this task, the police broke into the defendant's apartment, searched it, then waited for the defendant to return to his apartment where the officers held him at gunpoint and placed him under arrest. *Id.* at 593, 95 S.Ct. at 2256–2257, 45 L.Ed.2d at 421. Following his arrest, the defendant waived his *Miranda* rights and gave two inculpatory statements to the police. *Id.* at 594–96, 95 S.Ct. at 2257–2258, 45 L.Ed.2d at 421–422. In holding that the defendant's waiver of *Miranda* rights alone was insufficient, as an intervening factor, to purge the taint of the defendant's illegal arrest, the Court emphasized the purposefulness of the official misconduct involved by explaining:

> The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was 'for investigation' or for 'questioning.' The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which Brown's arrest was effected gives the

appearance of having been calculated to cause surprise, fright, and confusion.

*Id.* at 605, 95 S.Ct. at 2262, 45 L.Ed.2d at 428.

The United States Supreme Court further refined its analysis of the attenuation doctrine set forth in *Brown v. Illinois,* to include an exploration of voluntariness. *See United States v. Ceccolini,* 435 U.S. 268, 276–77, 98 S.Ct. 1054, 1060, 55 L.Ed.2d 268, 277 (1978). The case involved a police officer's unauthorized search of a cash register in a local flower shop and discovery of an envelope containing evidence relating to the gambling activities of Ceccolini. The police officer immediately questioned the clerk at the flower shop concerning the identity of the owner of the envelope without revealing to the clerk what it contained. Four months later the FBI interviewed the flower shop clerk who related what had occurred with the police officer. Thereafter, the Government introduced testimony of the flower shop clerk, who volunteered to testify, at a perjury trial of Ceccolini. Ceccolini argued that the testimony of the clerk should have been suppressed as "fruit" of the police officer's unlawful search of the register at the shop.

The trial court suppressed the testimony of the flower shop clerk which was affirmed by the Court of Appeals for the Second Circuit. The Supreme Court reversed, citing *Brown v. Illinois,* in stating, "[e]ven in situations where the exclusionary rule is plainly applicable, we have declined to adopt a "per se or 'but for' rule" that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation" originating with constitutionally violative conduct. *Ceccolini,* 435 U.S. at 276, 98 S.Ct. at 1060, 55 L.Ed.2d at 277. In *Ceccolini,* the court eloquently defined the role that "logical" causation has to the defining question:

This, of course, makes it perfectly clear, if indeed ever there was any doubt about the matter, that the question of causal connection in this setting, as in so many other questions with which the law concerns itself, is not to be determined

solely through the sort of analysis which would be applicable in the physical sciences. The issue cannot be decided on the basis of causation in the logical sense alone, but necessarily includes other elements as well.

*Id.* at 274, 98 S.Ct. at 1059, 55 L.Ed.2d at 276.

The Court identified the voluntary aspect of a witness's testimony as a break in the chain of taint emanating from the unlawful conduct because an individual has the "attributes of will, perception, memory and volition." *Id.* at 277, 98 S.Ct. at 1060, 55 L.Ed.2d at 277 (quoting *Smith v. United States,* 324 F.2d 879, 881 (D.C.Cir.1963), *cert. denied,* 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964))(footnotes omitted). The significance of a volitional act of a human being under the exclusionary rule cannot be underestimated because:

[t]he proffer of a living witness is not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized. The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, because the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give. The uniqueness of this human process distinguishes the evidentiary character of a witness from the relative immutability of inanimate evidence.

*Id.* at 277, 98 S.Ct. at 1060–1061, 55 L.Ed.2d at 277 (quoting *Smith v. United States,* 324 F.2d at 881–882).

In assessing the voluntariness of the witness's conduct under the attenuation doctrine of the exclusionary rule, the Court explained:

Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet. Witnesses can, and often do, come forward and offer evidence entirely of their own volition. And evaluated properly, the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence.

*Id.* at 276–277, 98 S.Ct. at 1060, 55 L.Ed.2d at 277. Thus, the voluntariness of a person's actions in providing evidence or testimony should be considered as an intervening factor under the attenuation doctrine. *See id.* at 278–279, 98 S.Ct. at 1061, 55 L.Ed.2d at 278. This is true even if a putative defendant is involved because exclusion of testimony is a perpetual disability:

> Another factor which not only is relevant in determining the usefulness of the exclusionary rule in a particular context, but also seems to us to differentiate the testimony of all live witnesses—even putative defendants—from the exclusion of the typical documentary evidence, is that such exclusion would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby.

*Id.* at 277, 98 S.Ct. at 1061, 55 L.Ed.2d at 277–78. We follow the lead of the numerous federal circuits and states that have applied *Ceccolini. See Peavy v. WFAA–TV, Inc.,* 221 F.3d 158, 174 (5th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 2191, 149 L.Ed.2d 1023 (2001); *United States v. McKinnon,* 92 F.3d 244, 247 (4th Cir.1996), *cert. denied,* 519 U.S. 1099, 117 S.Ct. 784, 136 L.Ed.2d 726 (1997); *United States v. Hooton,* 662 F.2d 628, 632–33 (9th Cir.1981), *cert. denied,* 455 U.S. 1004, 102 S.Ct. 1640, 71 L.Ed.2d 873 (1982); *United States v. Stevens,* 612 F.2d 1226, 1230 (10th Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980); *State v. Bravo,* 158 Ariz. 364, 762 P.2d 1318, 1327 (1988), *cert. denied,* 490 U.S. 1039, 109 S.Ct. 1942, 104 L.Ed.2d 413 (1989); *People v. Briggs,* 709 P.2d 911, 917 (Colo.1985).

 The first evidence we must consider is that provided by Jona Miles, who led the police to the discovery of the murder weapon and its accessories in the Choptank River, to appellant's clothing and to appellant's whereabouts on the day of his arrest. When Jona Miles was arrested on April 22, 1997, the police gave Jona her *Miranda* warnings, and she agreed to give a statement to the police. An individual may validly waive his or her Fifth Amendment rights by making

526

incriminating statements subsequent to receiving the warnings required by *Miranda*. *See United States v. Carson*, 793 F.2d 1141, 1150 (10th Cir.1986), *cert. denied*, 479 U.S. 914, 107 S.Ct. 315, 93 L.Ed.2d 289 (1986). While an individual's waiver of *Miranda* warnings taken alone would be insufficient to purge the taint of the original unlawful conduct under a Fourth Amendment analysis, Jona Miles's conduct with regard to her actions following her statement to the police, manifesting those uniquely human attributes of perception, memory and volition, were "sufficiently an act of free will to purge the primary taint" associated with the intercepted phone call. *Brown*, 422 U.S. at 602, 95 S.Ct. at 2261, 45 L.Ed.2d at 426 (quoting *Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416–417, 9 L.Ed.2d at 454)(internal quotations omitted).

Following her statement to the police, Jona Miles took the police to the Choptank River to show them where she had disposed of the murder weapon and its accessories, as well as to a dumpster located off of Route 404 near the Choptank River in Denton, Maryland where she had disposed of appellant's clothing. She also provided the police with information concerning appellant's whereabouts to assist them in effectuating the arrest.[11] Upon searching the dumpster, the police found that it had been emptied. However, a team of divers was able to recover the weapon and ammunition from the river. The murder weapon, a .22 caliber gun, was admitted in evidence at trial as State's Exhibit 11, and the box of ammuni-

---

11. Prior to receipt of the tape from James Towers, the police had already conducted investigations at the stores where the victim's credit cards had been used following his disappearance. The police ascertained a physical description of the suspect and circulated it on the local news stations. The victim's brother had also provided police with a description matching appellant based on his sighting on April 4, 1997, when he discovered his brother's body. Sergeant Bruce Dana and Corporal Cynthia Dougherty of the Maryland State Police also witnessed appellant talking on his cell phone in the gray car near the crime scene that same day. Although Jona Miles's voluntary assistance in ascertaining appellant's whereabouts on the day of his arrest helped police to locate him more rapidly, the police had already physically identified their suspect.

tion found with it in the river was admitted as State's Exhibit 12.

The police did not coerce Jona Miles in any way, nor did they offer her any leniency in order to induce her statement or compel her to lead them to evidence. Based on our review of the excerpts of Jona Miles's statement contained in the record,[12] the police never confronted Jona Miles with the fact that they possessed a tape of the cellular phone conversation between her husband and her. The evidence obtained as a result of Jona Miles's voluntary conduct need not be suppressed even though the unlawful police conduct in listening to the tape of the cellular phone conversation "was one step in a series of events" leading up to Jona Miles's statement and production of evidence. *Hooton,* 662 F.2d at 632 (citing *United States v. Leonardi,* 623 F.2d 746, 752 (2nd Cir.1980), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980 )). Any taint emanating from the original unlawful disclosure of Jona Miles's voice to the police in the taped cellular phone conversation in violation of the Maryland Wiretapping Act dissipates at the point where she took the Maryland State Police on a guided tour of the locations where she had disposed of evidence.

We also must consider the temporal relationship of Jona Miles's assistance to the police to the unlawful disclosure of the cellular phone conversation under the Maryland Wiretapping Act. The first factor of the *Brown v. Illinois* test of attenuation examines the proximity between the time of the initial illegality and the ascertainment of the evidence that a defendant is seeking to suppress. *See Brown,* 422 U.S. at 603–604, 95 S.Ct. at 2261–2262, 45 L.Ed.2d at 427. The Supreme Court has not set forth "any mathematically precise test for determining at what point the taint has been purged by the lapse of time." *Ferguson,* 301 Md. at 550, 483 A.2d at 1259. Intervening factors or acts following the original unlaw-

---

12. Appellant and the State only produced excerpts of Jona Miles's statement in the record, which are numbered as pages 2, 11, 19, 25 and 43.

ful conduct, however, should be considered in assessing attenuation. *See Brown*, 422 U.S. at 603–604, 95 S.Ct. at 2261–2262, 45 L.Ed.2d at 427. In *Brown*, the defendant's confession was suppressed based in part on the fact that the confession took place less than two hours after the "primary illegality" of defendant's unlawful arrest, with no intervening circumstances. *See id.* at 604–05, 95 S.Ct. at 2262, 45 L.Ed.2d at 428. The original illegality complained of in the instant case took place on April 15, 1997, when James Towers tape recorded the cellular phone conversation between Jona and Jody Miles and turned it over to the police. Both Jona and Jody Miles were not arrested until seven days later. In the interim, and without knowledge that her conversation with appellant had been recorded by a private citizen, Jona Miles disposed of the clothing that appellant purchased with the victim's credit card at Structure in a dumpster off of Route 404 near Denton, Maryland, and threw the .22 caliber gun, holster, and ammunition into the Choptank River. Jona Miles engaged in two volitional acts with regard to this evidence, first in throwing them away and second in leading the police to the locations wherein she had disposed of them. In both instances, Jona Miles's conduct weighs of equal significance, as she made conscious choices on both occasions to do what she did.

Because Jona Miles disposed of the evidence subsequent to the cellular phone conversation and not only disclosed the location of the gun in her statement to the police, but physically took the police to the Choptank River, her conduct with regard to the gun and its accessories was completely free and independent from the information the police may have learned from the taped cellular phone conversation. The dissent concludes that Jona Miles's statement and assistance to the police was as a result of being confronted with evidence obtained by the police from the illegally intercepted phone conversation. The record, however, does not reflect any disclosure by the police of the fact that they possessed the taped cellular phone conversation. Furthermore, the excerpts in the record of the taped phone conversation contain no references

to the Structure store at the Dover Mall, the murder weapon or the Choptank River, all of which were facts that came to be known to the police through their independent investigation. Therefore, there was no abuse of discretion by the trial judge in admitting the murder weapon and its accessories to which Jona Miles led the police, as Jona Miles's voluntary actions purged the taint from the original unlawful disclosure of the taped cellular phone conversation by the police to obtain the initial search warrant under Section 10–405 of the Maryland Wiretapping Act.

We now consider the admission in evidence at trial of appellant's black jeans and tan dress pants. Following her arrest, Jona Miles signed a Caroline County Sheriff's Department consent to search and seize form authorizing the police to conduct a second search of her trailer. During this second search, Corporal Lee Ann Fisher of the Maryland State Police found and seized one pair of black men's jeans in the rear bathroom clothes hamper and one pair of tan dress pants from Structure on the front porch. These items were admitted jointly at trial as State's Exhibit 21. Appellant argues that the two pairs of pants should have been suppressed at trial as derivative evidence stemming from the Maryland State Police's unauthorized use of the taped cellular phone conversation. We disagree. An individual may voluntarily waive his or her Fourth Amendment rights, through "an intervening act free of police exploitation of the primary illegality" which is "sufficiently distinguishable from the primary illegality to purge the evidence of the primary taint." *See Carson,* 793 F.2d at 1147–48. The intervening factor of an individual's voluntariness under Fourth Amendment analysis applies equally to purging the taint associated with the taped cellular phone conversation in the case at bar. Jona Miles's voluntariness must be considered in light of the totality of the circumstances. *See Gamble v. State,* 318 Md. 120, 125, 567 A.2d 95, 98 (1989)(citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854, 863 (1973)).

■ At the time Jona Miles signed the consent to search and seize form, she knew that she could be charged with criminal conduct for concealing and destroying evidence on behalf of her husband. However, she chose to assist the police, without any promise of leniency, in the investigation. Furthermore, a person in custody may still give valid consent to a search. *See Doering v. State*, 313 Md. 384, 402, 545 A.2d 1281, 1290 (1988)(citing *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598, 609 (1976)). Thus, the fact that Jona Miles was under arrest at the time she gave her statement to police and signed the consent to search form does not negate the voluntary nature of her actions. Considering the totality of the circumstances, Jona Miles waived her Fifth and Fourth Amendment rights and purged the taint of the original illegality of the taped cellular phone conversation by volunteering information to the police and signing a consent form authorizing the police to return to her trailer and conduct further investigation and seizure of evidence. Thus, the trial judge did not err in allowing the admissibility in evidence of the black jeans and tan Structure dress pants.

■ We now consider appellant's arrest and statement to police. Appellant argues that the trial judge erred in admitting in evidence at trial his post-arrest confession, maps he drew of areas where he disposed of evidence and property belonging to the victim, and his cellular telephone, which had been seized pursuant to a post-arrest police inventory of the gray 1984 Chevrolet Cavalier appellant had been driving at the time of his arrest.

In the days following Edward Atkinson's murder, the Maryland State Police and Atkinson's family and friends gathered evidence about the murderer and his whereabouts. By April 4, 1997, the victim's brother, Wayne Atkinson, had provided the police with information concerning all of the victim's credit card accounts, and had determined that the credit card had been used at the Tru Blu gas station in Harrington, Delaware after his brother's disappearance. Wayne Atkinson went to the Tru Blu and questioned one of the employees who gave

him a description of the card user and the card user's car. The physical description matched that of appellant. On April 4, 1997, following the discovery of Edward Atkinson's body, Wayne Atkinson, his friend, Sean Mooney, and Sergeant Bruce Dana and Corporal Cynthia Dougherty of the Maryland State Police all witnessed a gray Chevy Cavalier with Delaware temporary tags, driven by a white male with short dark hair in his twenties talking on a "bag style" cellular telephone in the area of the crime scene.

Subsequent investigation confirmed the information learned by the police in the first few days of the investigation. The Atkinson family turned over all credit card information to the police, who conducted investigations into the purchases made with the victim's credit cards. Those investigations included interrogation of the manager and several employees of the Tru Blu, the manager of Structure at the Dover Mall who sold clothing to appellant, the clerk at J.C. Penney's in the Dover Mall who sold appellant a diamond ring, and a waitress and patrons at Shucker's Pier 13 Restaurant in Dover where appellant purchased food with the victim's credit card. All of the merchants provided the police with copies of the receipts from the purchases made by appellant, as well as matching physical descriptions of the appellant. Based on this information, and on detailed assistance from one of the patrons from Shucker's, the police produced a composite sketch of appellant that was circulated by the local media. All of this information was known to the police *before* James Towers taped the cellular phone conversation between Jona and Jody Miles.

Once appellant had been arrested and brought to the Caroline County Sheriff's Department, Corporal William V. Benton of the Maryland State Police interviewed him. Before questioning commenced, Corporal Benton presented appellant with the Maryland State Police Advice of *Miranda* Rights Form. The *Miranda* warnings were read to appellant and he acknowledged that he understood his rights prior to signing and dating the form. Corporal Benton asked appellant general questions for a few minutes, and then asked him if he knew

Edward Atkinson. When appellant denied knowing Atkinson, the following dialogue took place:

Benton: Jody, would it surprise you if I told you there was a picture of you at the Wal–Mart in Cambridge? Wal–Mart has a camera system inside. There's an ATM inside. We've got a guy that was killed on April the 2nd, 1997. His name was Edward Atkinson. Okay? His brother was riding on that road on, I believe, it was April the 4th and saw a little silver car with Delaware temporary tags with a white male, with brown hair and talking on a cell phone riding on Old Bradley Road. He tried to get the police to stop that car at that time. For some reason, they were taking down the crime scene and they did not. We have reason to believe that was your car that was on Old Bradley Road on that particular day. Okay, it's the 3rd or 4th of April. And to get back to my point, Wal–Mart in Cambridge has a camera and they have an ATM in the Wal–Mart. Our victim's credit cards were attempted on April the 2nd, 6:59 and 7:00. And the photo we have at the Wal Mart looks an awful lot like you.

Miles: I don't believe that.

Benton: Well, whether you believe it or not, it's the truth. Also, at J.C. Penney's store in Dover, the jewelry section. There was a ring purchased with our victim's credit card. There's a photo there that looks an awful lot like you. There's bubbles everywhere in that ceiling and they have a ton of cameras. Coming in you kept your back to it a little bit, but you couldn't keep it all the way to it. You walked up to the—when you're walking down the aisle. It shows a perfect photo. The Harrington Tru Blu, you had a pair of whitish colored slacks, black cowboy boots, and white shirt that's buttoned up. They've seen you in there. They've seen you in there using the victim's credit card.

Miles: I have a white shirt—

Benton: I'm not done. The Structure store in Dover Mall. There's a ton of Structure clothing that was purchased with our victim's credit card. The description they give

fits that of you. I'm not here to bull crap you around, I'm being honest with you. We've done a search warrant on your house today. We've recovered Structure pants, Structure jeans, Structure shirt that was hidden in Larry's closet. Okay?

Miles: You're going to find Structure clothes in—

Benton: I'm not going to find this brand new Structure shirt that was hid in Larry's closet. We've recovered a gun from right down here in the river, a little 22 with a long barrel on it. Okay? We've recovered clothes from a dumpster right down on 404.[13] So, we're not in here playing games. You're a smart person; I'm a smart person. But, I'm here to tell you there's a reason why everything happens. Okay? What I'm here to ask you is for you to tell us why things happen. I know you killed Edward Joseph Atkinson. Okay, I'm not going to sit here and play dumb with you and let you play dumb with me. We're adult men, it's time to find out why. I'm not interested in sending you to prison for the rest of your life but I want to know why you killed this man. He's a pillar in the community, he was active with Community Players and now he's dead. Jody, I don't think you're a bad person. Yeah, you've been arrested. I know that and you know that. But things happen for a reason. Was somebody pushing you to kill this man?

Shortly thereafter, appellant gave the following account of the events of April 2, 1997:

Miles: I don't know what the deal was. It don't necessary have to be money, it could be drugs, it could be a lot of things. I don't know. I don't know that part of it. I just know that I was supposed to meet the man. You know, like you said. There was no struggle.

---

13. At this time, the police had not yet recovered the gun from the Choptank River. When the police searched the dumpster on Route 404 with Jona Miles, the dumpster was empty. Although the police did not actually have photographs of appellant at these various stores, they did have physical descriptions from store employees as well as receipts of purchases made by appellant with the victim's credit cards.

Benton: Okay.

Miles: The man showed up and there he was. When I was asking him for the stuff, all I said was, you know, I need the package. That's all he told me. And then he tried to tell me he didn't have it, he didn't have none of it and anything like this and when he went to reach in his jacket, I was standing right behind him. And he went to reach in his jacket, I didn't know what he was getting.

Benton: So, what did you do?

Miles: That's when it happened.

Benton: That's when what happened?

Miles: That's when he got shot.

Benton: So, you shot him?

Miles: Yeah.

Appellant subsequently admitted to attempting to use the victim's credit cards at the ATM in Wal Mart, to purchase gas at the Tru Blu, clothing at Structure in the Dover Mall, a diamond ring for Jona Miles at J.C. Penney's in the Dover Mall, and food at Shucker's Pier 13 Restaurant in Dover, Delaware. After he finished his statement, appellant volunteered to draw maps for the police of the location where he stated he had thrown away the victim's wallets and briefcases.

Appellant demonstrated a willingness to provide information and to locate physical evidence related to the crime through his voluntary statement to the police. *See Ceccolini*, 435 U.S. at 276–77, 98 S.Ct. at 1060, 55 L.Ed.2d at 277. He received his *Miranda* warnings in both written and oral form prior to signing a statement waiving his Fifth Amendment rights, and confirmed in his taped confession that he understood his rights and agreed to give a statement to the police. The police never showed any of the illegally-seized evidence gathered prior to Jona Miles's arrest in questioning appellant. *See United States v. McKinnon*, 92 F.3d at 248. He confessed to the murder of Edward Atkinson shortly after the interview commenced. Appellant could have stopped the questioning at any point during the interview, but he went so far as to draw

maps for the police of the locations of evidence related to the murder.

With regard to the second-prong of the *Ceccolini Brown* test, the police never mentioned the intercepted cellular phone conversation to induce appellant's statement. The police never disclosed in questioning appellant the contents of the cellular phone conversation, nor the fact that Jona Miles had given them a statement. The dissent excerpts a portion of the interrogation where Corporal Benton informed appellant that the police had seized a new Structure shirt and other clothing purchased at the Structure store with the victim's credit cards. While the police had, in fact, seized this evidence, they did not show it to appellant just as the police officer in *Ceccolini* did not show the florist clerk the envelope with money and gambling slips and never made any reference to its contents. Although the seizure of the shirt itself had been accomplished through executing the search warrant based in part on the information contained in the taped cellular phone conversation, the police already possessed copies of receipts from appellant's purchases from their investigation at the Structure store. One of the Structure receipts, entered in evidence at trial as State's Exhibit 16–C, lists all of the items purchased by appellant with the victim's credit card, including a shirt.

The dissent asserts that our analysis "seems to flirt with either independent source or inevitable discovery analysis." Diss. Op. at 576, n. 2. The independent source doctrine has been applied in case law generally to refer to all evidence acquired in a lawful fashion, untainted by any illegal evidence-gathering activity of the state. *See Segura v. United States,* 468 U.S. 796, 813–14, 104 S.Ct. 3380, 3390, 82 L.Ed.2d 599, 614 (1984). This refers to evidence which is different from the evidence originally obtained by unlawful means. *Id.* The doctrine's original application in *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), however, referred to situations where the evidence acquired through untainted means is identical to that which had been obtained through unlawful evidence gathering. *See id.* at 391–

92, 40 S.Ct. at 182–83, 64 L.Ed. at 321. Therein Justice Holmes explained:

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others . . .

*Id.* at 392, 40 S.Ct. at 183, 64 L.Ed. at 321. Thus, the independent source doctrine, similar in effect to the attenuation doctrine, seeks to balance the need to deter unlawful conduct of law enforcement with the public interest in justice by "putting police in the same, not a *worse,* position that they would have been in if no police error or misconduct had occurred." *Nix v. Williams,* 467 U.S. at 443, 104 S.Ct. at 2509, 81 L.Ed.2d at 387(emphasis in original). This is accomplished "by allowing the introduction of evidence discovered initially during an unlawful search if the evidence is discovered *later* through a source that is untainted by the initial illegality." *United States v. May,* 214 F.3d 900, 906 (7th Cir.2000).

In the case before us, we are not concerned with after-acquired untainted evidence which would inspire invocation of the independent source doctrine. Instead, we find it significant that the facts used by the police in questioning appellant were all facts learned by the police through lawful investigative means *prior* to receiving the tape of the cellular phone conversation from Mr. Towers. The focus of the inquiry concerning the extent of the taint running from the unlawfully intercepted cellular phone conversation should rest with the use which was made of it as opposed to a wide-sweeping prohibition concerning the facts articulated therein. *See United States v. Grosenheider,* 200 F.3d 321, 329–30 (5th Cir.2000)(explaining that the fact that the investigator had effectively seized defendant's harddrive by maintaining possession of a computer containing evidence of the defendant's use of child pornography while a warrant for a search of the hard-drive was being obtained did not require exclusion of

evidence obtained pursuant to a validly authorized and executed search warrant because the investigator did not make any use of the computer prior to obtaining a warrant for the search).

Appellant's decision to give a statement to the police was voluntary; in fact, it was the product of a volitional act rather than a product of exploitation and manipulation of the unlawful evidence gained from the cellular phone conversation. *See Carson*, 793 F.2d at 1147–1148. The balancing approach to attenuation which has evolved from *Brown v. Illinois* requires consideration of a totality of the circumstances, including the demeanor of the individual throughout the interrogation, the extent of the individual's cooperation with the police, and personal circumstances unique to the age, knowledge and experience of the individual. *See United States v. Wellins*, 654 F.2d 550, 555 (9th Cir.1981). At the time appellant waived his *Miranda* rights and gave his confession, he was not under the influence of drugs or alcohol. This was not a situation involving a "caged rabbit" who manifested fear and anxiety over his predicament. On the contrary, throughout his confession, appellant remained relaxed and cooperative and never indicated that he wished to stop talking or take a break.

The Supreme Court has recognized that, "In view of the deterrent purposes of the exclusionary rule, consideration of official motives may play some part in determining whether application of the exclusionary rule is appropriate *after* a statutory or constitutional violation has been established." *Scott v. United States*, 436 U.S. 128, 135–136, 98 S.Ct. 1717, 1722–1723, 56 L.Ed.2d 168, 176–77 (1978)(interpreting the federal wiretapping statute)(emphasis in original). This concept is embodied in the third factor of the *Brown v. Illinois* test, which requires an examination of the flagrancy of the police misconduct in obtaining evidence from Jona and Jody Miles. *See Brown*, 422 U.S. at 604, 95 S.Ct. at 2262, 45 L.Ed.2d at 427; *United States v. Rodriguez*, 585 F.2d 1234, 1242 (5th Cir.1978)(applying *Brown* and *Ceccolini* in holding that the lower court did not err in denying defendant's motion to suppress where the record indicated that defendant know-

ingly and voluntarily waived his *Miranda* rights and gave a confession and "the government's conduct was not flagrant or reprehensible").

The Maryland State Police never authorized or requested that James Towers record appellant's cellular phone conversation, nor did the police assist Mr. Towers in the interception.[14] The dissent's analysis of attenuation verges on a traditional tort analysis of proximate cause which while tempting, is inappropriate to an assessment of attenuation of the taint of unlawful police conduct under Fourth and Fifth Amendment jurisprudence. *See Ceccolini,* 435 U.S. at 276, 98 S.Ct. at 1060, 55 L.Ed.2d at 277.

Although Section 10–405 mandates the exclusion of the tape and its contents from evidence, it would completely contravene the statutory goal to apply a *per se* exclusion to all evidence obtained thereafter as a result of pursuing an investigation and from the voluntary conduct of witnesses or suspects who provide additional evidence. *See United States v. Salgado,* 807 F.2d 603, 607 (7th Cir.1986)("The exclusionary rule is a sanction, and sanctions are supposed to be proportioned to the wrongdoing that they punish."). Here, the police did exactly what anyone would have expected them to do.

The conduct of the Maryland State Police in listening to the tape of the cellular phone conversation provided to them by James Towers is completely distinguishable from the flagrant and purposeful misconduct of the police officers in *Brown* who arrested someone for the sole purpose of engaging in a factual fishing expedition to link that person to an ongoing murder investigation. *See Brown,* 422 U.S. at 592, 95 S.Ct. at 2256, 45

---

**14.** Although we consider the lack of police involvement in obtaining the tape of the cellular phone conversation between Jona and Jody Miles as a factor in dissipating the taint of this evidence on subsequent evidence received in the case, we decline to go so far as to adopt the "clean hands doctrine" of *United States v. Murdock,* 63 F.3d 1391 (6th Cir. 1995). In *Murdock,* the Court of Appeals for the Sixth Circuit held that where the government took no part in unlawful interceptions in violation of the Federal Wiretapping Statute, there would be a "clean hands" exception to the statutory exclusionary rule embodied in Section 2515. *See id.* at 1404.

L.Ed.2d at 420. It cannot be said that James Towers, the private citizen who intercepted appellant's cellular phone conversation, "acted as an instrument or agent of the state." *State v. Abdouch,* 230 Neb. 929, 434 N.W.2d 317, 323 (1989)(quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 487, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564, 595 (1971)). "The [exclusionary] rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way-by removing the incentive to disregard it." *Elkins,* 364 U.S. at 217, 80 S.Ct. at 1444, 4 L.Ed.2d at 1677. At the hearing on appellant's pretrial motion to suppress, the trial court aptly stated, "the horrifying thing about the whole situation, really, is that if the police had done nothing, having this information, I cannot imagine what would have been thought by the public." The information contained in the cellular phone conversation led the police to believe that appellant and his wife were conspiring to get rid of the evidence. To construe the Wiretapping Act to require us to hold under the unique facts and circumstances of this case that the police should have refrained from listening to the tape provided by Mr. Towers and sat idly by while appellant and his wife eliminated evidence of the crime would produce a result which is "unreasonable, illogical, inconsistent with common sense, and absurd." *Edgewater Liquors, Inc. v. Liston,* 349 Md. 803, 811, 709 A.2d 1301, 1304 (1998).

While "the *Brown* test does not require that each of the factors set forth be resolved in favor of the Government" in order to render evidence admissible under the attenuation doctrine, we find that considering the totality of the facts and circumstances of this case, the balance falls in favor of the State. *See United States v. Wellins,* 654 F.2d at 554. We therefore conclude that the trial judge properly drew the line between the taint of the original illegality of the unlawfully intercepted cellular phone conversation by a private citizen and found attenuation from the taint commencing with Jona Miles's voluntary statement and assistance to the police, and appellant's voluntary confession to the murder of Edward Atkinson.

### IV. RULE 4–326

At approximately 4:00 p.m. on March 18, 1998, the jury began deliberations in the sentencing phase of the trial. During the course of the deliberations, the jury sent out three notes. The clerk received the first note at 4:25 p.m. and the second note at 7:48 p.m., requesting beverages and inquiring as to dinner arrangements. The third note, received at 11:20 p.m., contained the following question:

Section V Para. 2

If we are not unanimous, do we enter *no* automatically or do we need to be unanimous that no *is* the answer.

Section VI

How can we answer this question if we were not unanimous on the *no* vote.[15]

The trial court informed counsel of receipt of the note and summarized the contents of the note for counsel:

[T]he thrust of the communication is that the jury is uncertain as to whether they must be unanimous with respect to part 5—or Section V, paragraph 2, which is the one very clearly—because they do have to be unanimous—I don't know what they're talking about in Part 2 but be that as it may.

All right. I think that what we should do is to read them again the instructions with respect to parts—or to Sections V and VI, that seems, to me, [to] make good sense. I see no reason to backtrack and go over things. I think that we

---

**15.** Section V of the sentencing form stated as follows:

Each individual juror shall weigh the aggravating circumstances found unanimously to exist against any mitigating circumstances found unanimously to exist, as well as against any mitigating circumstance found by that individual juror to exist.

We unanimously find that the State has proven BY A PREPONDERANCE OF THE EVIDENCE that the aggravating circumstances marked "proven" in Section III outweigh the mitigating circumstances in Section IV.

Section VI of the sentencing form required the jury to determine whether to impose a "Life Imprisonment" or "Death" penalty based on the jury's responses in each of the previous sections of the sentencing form.

can safely assume—I think we should assume that they have winded their way through I through IV in some fashion that is consistent with the instruction. And where they are hung up is their desire to be clarified on whether or not they must reach a conclusion on No. 5. All right. Neither the State nor defense counsel read the note or requested to inspect the note at that time. After hearing no objections to his proposed re-instruction of the jury, the trial court reviewed the instructions for Sections V and VI, and advised the jury "your determination in Section V must be unanimous. Until all 12 of you agree on whether the answer is yes or no, do not go to Section VI." The jury returned to finish deliberations, and returned a sentence of death at approximately 1:42 a.m. on March 19, 1998.

Appellant filed a Motion for New Sentencing And / Or Imposition of a Life Sentence In Lieu of Death Sentence on March 26, 1998 postulating that Maryland Rule 4–326(c) requires the trial judge to repeat verbatim the contents of the jury note for the record. The failure to do so, according to appellant, deprived him of the ability to propose the following: 1) Declare a mistrial based on jury deadlock after reasonable deliberation; 2) Request that the jury be instructed to move on to Section VI to determine whether a sentence of life with or without parole should be imposed; or 3) Request a modified Allen Charge, as approved by *Booth v. State,* 327 Md. 142, 159, 608 A.2d 162, 170 (1992), *cert. denied,* 506 U.S. 988, 113 S.Ct. 500, 121 L.Ed.2d 437 (1992), to reflect that the jurors were unable to agree on Section V. On July 7, 2000, the trial court denied the motion in a written order that stated, "Beyond any doubt, the Court did not follow the plain direction of Rule 4–316(c), as explicated in *Allen v. State,* 77 Md.App. 537, 551 A.2d 156 in that one of the communications was not read *verbatim* into the record." (emphasis in the original).[16] In denying the motion, the trial court concluded that the summary provided on the record by the trial court did not differ

---

**16.** It is clear from the record that the order meant to refer to Md. Rule 4–326(c).

from the substance of the note such that "the oversight was purely technical in nature."

■ The relevant provision, Maryland Rule 4–326(c)(2000 Supp.) provides:

> The court shall notify the defendant and the State's Attorney of the receipt of any communication from the jury pertaining to the action before responding to the communication. All such communications between the court and the jury shall be on the record in open court or shall be in writing and filed in the action.

Appellant argues that Rule 4–326(c) requires complete, verbatim communication to counsel of the contents of any communication between the jury and the court. The State contends that defense counsel's failure to request to inspect the jury note prior to the trial judge's re-instruction of the jury bars consideration of this issue on appeal. In the alternative, the State asserts that the trial judge's failure to disclose the contents of the jury note in its entirety is harmless beyond a reasonable doubt.

With respect to preservation of the issue, it is clear that Maryland Rule 8–131 governs the scope of review available in this Court.[17] Review is typically limited to questions raised in and decided by the lower court. *See Young v. State,* 220 Md. 95, 99, 151 A.2d 140, 143 (1959), *cert. denied* 363 U.S. 853, 80 S.Ct. 1634, 4 L.Ed.2d 1735 (1960). We have exercised our discretion in some cases including some death penalty cases, to determine all questions briefed and argued by the appellant before this Court even when not tried and decided by the lower court. *See Bartholomey v. State,* 260 Md. 504, 513, 273 A.2d 164, 169 (1971), *modified,* 408 U.S. 938, 92 S.Ct. 2870, 33 L.Ed.2d 759 (1972), *reh'g denied,* 409 U.S. 901, 93 S.Ct. 180, 34 L.Ed.2d 162 (1972). Although defense counsel did not object

---

17. Rule 8–131(a) provides: "Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal."

to the summarization of the jury note at the time the note was received, the issue of the trial judge's failure to comply with Rule 4–326(c) was raised by counsel and decided by the trial court as part of appellant's post-trial motion and was briefed and argued in this Court.

With respect to the reading of a communication to the jury, this Court recently stated:

> The rules governing communications between the judge and the jury are basic and relatively simple to adhere to in practice. If a judge receives a communication from the jury or wishes to communicate with the jury, he or she is required to notify the parties. *See* Md. Rule 4–326(c). The communication with the jury shall be made in open court on the record or shall be made in writing and the writing shall become part of the record. *See* Md. Rule 4–326(c). Putting aside certain exceptions not relevant here, the defendant has a recognized right to be present during communications between the judge and the jury during his trial. *See* Md. Rule 4–231(b); *Stewart v. State,* 334 Md. 213, 224–25, 638 A.2d 754, 759 (1994); *Williams v. State,* 292 Md. 201, 211, 438 A.2d 1301, 1306 (1981)("a criminal defendant's right to be present at every stage of his trial is a common law right [and] is to some extent protected by the Fourteenth Amendment to the United States Constitution"). These rules are not abstract guides. They are mandatory and must be strictly followed. *See Taylor v. State,* 352 Md. 338, 344, 722 A.2d 65, 68 (1998); *Stewart,* 334 Md. at 222, 638 A.2d at 758.

*Winder v. State,* 362 Md. 275, 322, 765 A.2d 97, 122–23 (2001).

Here the trial court did not give "full" notification of the contents of the note, because the trial court did not read the note verbatim but merely provided a summary of its contents prior to his discussion with counsel. Reading of the jury note in open court is not the only method of complying with Maryland Rule 4–326(c), as the rule may also be satisfied by filing written communications from the jury to the court in the case file for the action. The filing of the written communication with the action allows the parties to inspect the commu-

nication for themselves if they so desire. A failure to provide an opportunity for inspection in order to develop an appropriate response may provide the basis for an error. *See Smith v. State*, 66 Md.App. 603, 624, 505 A.2d 564, 574, *cert. denied*, 306 Md. 371, 509 A.2d 134 (1986). In *Allen v. State*, 77 Md.App. 537, 551 A.2d 156 (1989), *cert. denied*, 320 Md. 15, 575 A.2d 742 (1990), the Court of Special Appeals held that a trial judge must read the contents of any jury communication to the State and defense counsel before allowing the defendant to accept a majority verdict in a situation where the reading of the communication in its entirety would have resulted in his not accepting a majority verdict. *See Allen*, at 546, 551 A.2d at 160.

In the present case, the trial judge's failure to read the note, although not a violation *per se* of Rule 4–326(c), should be reviewed in determining whether the judge's summarization prejudiced the defendant. The circumstances surrounding the re-instruction of the jury indicate that appellant was not prejudiced by the trial court's actions. Appellant was present when the trial court re-instructed the jury regarding Sections V and VI of the sentencing form in compliance with Md. Rule 4–231. *See Midgett v. State*, 216 Md. 26, 36, 139 A.2d 209, 214 (1958)(explaining that in Maryland "there can be no valid trial or judgment" unless the defendant has been afforded the right to be present at all stages of the proceedings, including when being re-instructed by the trial court). However, we have stated that, "[w]here the right of confrontation is not implicated, and where there is involved no other right requiring intelligent and knowing action by the defendant himself for an effective waiver, a defendant will ordinarily be bound by the action or inaction of his attorney." *Williams*, 292 Md. at 219, 438 A.2d at 1310. In the matter now before this Court, neither party objected to the contents of the re-instruction of the jury either prior to re-instruction or prior to the jury rendering its sentencing verdict. Although appellant asserts that defense counsel would have responded differently had counsel been made aware of the actual contents of the jury note rather than the trial judge's

summary, there is nothing on the face of the note which indicates that the jury was deadlocked or otherwise incapable of reaching a decision. Furthermore, the trial court's response to the note indicates that the trial judge did not perceive any jury deadlock which would have warranted a mistrial, that the jurors had deliberated for an unreasonable amount of time, or that the jurors were unable to reach a unanimous decision with regard to Section V. Thus, appellant received the same response from the trial court as he would have received even if he had requested to review the contents of the jury note and presented his motion. Therefore, the appellant was not prejudiced by the failure of the trial court to read the note to counsel prior to re-instruction of the jury.

## V. JURY INSTRUCTIONS ON UNANIMITY

In both the original sentencing instructions and the re-instruction by the trial judge after receipt of the jury note at 11:20 p.m., the trial court informed the jury "your determination in Section V must be unanimous. Until all 12 of you agree on whether the answer is yes or no, do not go to Section VI." Although the parties approved the sentencing form prior to the trial judge's instruction of the jury, appellant now takes exception to the language requiring unanimity. Appellant argues that if a jury has deliberated for a significant period of time and requests guidance on how to proceed if the jury is not unanimous, the trial court should be required to instruct the jury that it may simply report its lack of unanimity to the court on the sentencing form.

In sentencing proceedings for criminal acts where the State seeks imposition of the death penalty, "[t]he determination of the court or jury shall be in writing, and, if a jury, shall be unanimous and shall be signed by the foreman." Maryland Code, Art. 27, § 413(i)(1957, 1996 Repl.Vol., 2000 Supp.). Section 413(k)(2) further provides, "[i]f the jury, within a reasonable time, is not able to agree as to whether a sentence of death shall be imposed, the court may not impose a sentence of death."

Determination of the reasonableness of the length of deliberations rests in the sound discretion of the trial court. *See Booth,* 327 Md. at 154, 608 A.2d at 167. Thus, "[t]he Maryland trial judge presiding over a capital sentencing proceeding before a jury basically retains the traditional role of determining whether the jury is hung." *Id.* The trial court may consider the nature of the decision before the jury, and the length of the trial in determining whether the jury has exceeded a reasonable time for deliberations. *See Colvin–el v. State,* 332 Md. 144, 181–82, 630 A.2d 725, 744 (1993), *cert. denied,* 512 U.S. 1227, 114 S.Ct. 2725, 129 L.Ed.2d 849 (1994)(finding no error in the trial court's refusal to dismiss the jury and enter a sentence of life imprisonment after the jury sent note to the court requesting clarification on the need for unanimity on Sections IV and V of the verdict sheet following eleven and a half hours of deliberations over a two-day period). The jury in the instant case had deliberated approximately seven hours before submitting the note in question to the court at 11:20 p.m.

Appellant asserts that instructing the jury in the midst of deliberations concerning the consequences of a jury's failure to render a unanimous decision does not present the same dangers as providing a similar instruction prior to deliberation where the court may fear that a juror might refrain from making a decision for a little more than a reasonable amount of time so as to prevent imposition of the death penalty, or in the converse, the jury may act hastily in deliberations without giving due consideration to the evidence in rushing towards a death sentence. In *Calhoun v. State,* 297 Md. 563, 468 A.2d 45 (1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984), we stated:

> Giving the instruction to the jury before deliberation could prompt someone to hold out for just a bit more than a reasonable time to insure that the death penalty was not imposed. It likewise could cause a jury to rush through its deliberations to avoid being called back by the court and told that because a reasonable time had passed without a verdict the sentence would be life imprisonment.

*Calhoun,* 297 Md. at 595, 468 A.2d at 60; *see also Ware v. State,* 348 Md. 19, 58, 702 A.2d 699, 718 (1997), *aff'd after remand,* 360 Md. 650, 759 A.2d 764 (2000), *cert. denied,* 531 U.S. 1115, 121 S.Ct. 864, 148 L.Ed.2d 776 (2001); *Bruce v. State,* 328 Md. 594, 622, 616 A.2d 392, 406 (1992), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993); *Oken v. State,* 327 Md. 628, 642–643, 612 A.2d 258, 265 (1992), *cert. denied,* 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993); *Grandison v. State,* 305 Md. 685, 771, 506 A.2d 580, 623 (1986), *cert. denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986). The United States Supreme Court has declined to mandate that an instruction on the consequences of jury deadlock routinely be given in all capital cases, explaining, "the Eighth Amendment does not require that the jurors be instructed as to the consequences of their failure to agree." *Jones v. United States,* 527 U.S. 373, 381, 119 S.Ct. 2090, 2098, 144 L.Ed.2d 370, 382, *reh'g denied,* 527 U.S. 1058, 120 S.Ct. 22, 144 L.Ed.2d 826 (1999). Unless and until the jury makes an unambiguous declaration that it is unable to come to a unanimous decision, the same dangers of undue jury influence as expressed in *Calhoun* and its progeny remain. The record indicates that the trial judge did not find a clear statement of deadlock from the jury; thus the situation did not warrant mid-deliberation instruction on the failure of unanimity.

The jury presented the trial judge in the instant case with a note concerning the application of Sections V and VI of the sentencing form. The judge's discussion with counsel on the record following receipt of the jury note and his subsequent re-instruction of the jury shows that the judge perceived that the jury was seeking clarification, not that he perceived a jury deadlock. Where the trial judge has exercised discretion and found that the jury has not exceeded a reasonable amount of time in deliberations nor an inability to reach a unanimous decision, the court is not required to provide an instruction to the jury concerning imposition of a life sentence in lieu of death.

After re-instruction, the jury returned to deliberate for approximately two hours before rendering a verdict. The jury

unanimously found that the State had proven that the aggravating circumstances outweighed the mitigating circumstances, and unanimously determined the sentence to be death. Accordingly, we find no error in the trial court's failure upon receiving the 11:20 p.m. jury note to provide an instruction to the jury that it could report its lack of unanimity.

## VI. CONSIDERATION OF MITIGATING FACTORS UNDER THE SENTENCING FORM AND JURY INSTRUCTIONS:

At appellant's request, the trial judge instructed the jury that, "[a]ny factor which causes you to feel sympathy or mercy toward the defendant may be considered by you to be a mitigating factor, so long as such factors are supported by the evidence and are considered by you to be within the framework of the verdict sheet." Appellant specifically requested this instruction regarding mitigating factors and raised no objection to the trial judge's instructions or the sentencing form at trial, but now asserts that the instructions and language of the sentencing form may have improperly restricted the jury's consideration of mitigating factors to those facts received in evidence. Generally, appellant's specific request of this instruction combined with a failure to properly object to it during the sentencing proceedings would constitute a waiver of any objection to the instruction. Although this issue was not properly preserved for appeal, appellant briefed and argued this issue in his appeal to this Court, accordingly, we will exercise our discretion to consider the jury's findings pursuant to Article 27, § 414(e) of the Maryland Code, which provides:

*Considerations by Court of Appeals.*—In addition to the consideration of any errors properly before the Court on appeal, the Court of Appeals shall consider the imposition of the death sentence. With regard to the sentence, the Court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or court's finding of a statutory aggravating circumstance under § 413(d); and

(3) Whether the evidence supports the jury's or court's finding that the aggravating circumstances outweigh the mitigating circumstances.

*See Tichnell v. State,* 287 Md. 695, 728, 415 A.2d 830, 847 (1980)(explaining that in capital cases, Section 414(e) directs the Court to consider the factors enumerated therein in addition to those otherwise properly raised before the Court on appeal).

The sentencing authority, whether it is a judge or jury, must consider the existence of mitigating circumstances in rendering a sentencing verdict. *See Tichnell,* 287 Md. at 729, 415 A.2d at 848. In so considering, the sentencing authority may take into account any facts or circumstances concerning the defendant including but not limited to the evidence presented at the merits and sentencing phases of trial in deciding whether a death sentence would be appropriate. *See Foster v. State,* 304 Md. 439, 474–475, 499 A.2d 1236, 1254 (1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986). The mitigating circumstances do not have to outweigh the aggravating circumstances in order to avoid imposition of the death penalty. *See White v. State,* 322 Md. 738, 746–47, 589 A.2d 969, 973 (1991). Rather, if the sentencing authority has found mitigating circumstances, the death sentence shall be imposed only if the sentencing authority finds that the aggravating circumstances outweigh the mitigating circumstances. *See* Code, Art. 27, § 413(h)(1) and (2).

Prior to allocution, the trial judge informed the jury that, "the evidentiary portion of this phase is now concluded. Under the law, the Defendant has a right to address you."

Appellant then gave the following allocution pursuant to Md. Rule 4–343:

I really don't know how I got myself in this position. Everyone I know would say that I'm a nice person. I try to help everyone and I never tried to hurt anyone on purpose. In the event that I did get angry, you heard that I would result to walking down the street or walking away from any problems I had. That was one thing I just had a hard time trying not to get angry towards people.

I don't get enjoyment out of hurting anyone, and anyone can tell you that I try not to do that. I get enjoyment out of making people laugh, smile, and have a good time. If I ever saw a person in need and I could help them, I would definitely try to do that. This is one reason why people don't see me doing anything like this.

People say and do things that they all regret. I'm sure everybody has. This one is at the top of my very long list. I wish that I could change the things that's happened but I can't do that. You can't imagine the guilt or sorrow I feel or the pain that the Atkinson must be going through, and I feel just terrible for it but I can't change anything that's happened.

It's been said that I had a lot of problems as a child that continued on through my adult life. And at a very early age I resorted to constant drinking and illegal activities to support myself and my alcoholic habits. I would try to hide the truth by lying to policemen, by stealing, or just doing anything illegal to get what I need to support my alcohol habit.

Now, I sit and think with the exception of a very few I try to think of my so-called friends. I never really had so-called friends. I had a lot of drinking buddies or maybe barroom acquaintances but never friends.

Alcohol has ruined my life, my kid's lives, and my relationship with others, and now a large amount of people associated with Mr. Atkinson. I still can't believe I'm standing here convicted of murder when I would never hurt anyone inten-

tionally. I regret all the mistakes I've made, and I know I can't makeup for them now. I regret the Atkinsons have loss a son, a brother, and a friend.

I know from what I heard Mr. Atkinsons he had a lot of friends, his mother. People could have learned a lot from what he had to offer in the theater and just his friends. I did not know Mr. Atkinson and I'm sure that it is not only my loss but others as well. I have a terrible feeling of guilt about Mr. Atkinson's death. I was able to see some of the pictures you have viewed as evidence as far as the autopsy and as far as the crime scene went. I get chills every time I see his picture on TV, in the paper, or just in my mind. I wake up in the middle of the night seeing those same pictures, just with all the regrets I have over everything. I can't believe that I got myself into any kind of situation like this. I care about people and I care about life itself, and I can't say how sorry I am for the death of Mr. Atkinson or how sorry I am for his family and for his friends. I also have regrets with what this has done to my kids and people close to me.

People close to me have made comments and they said if they had done things differently in the past with any situation as far as I went that maybe things wouldn't be this way today. Maybe if my upbringing was a little bit differently then I wouldn't be in this situation today. I don't blame anybody entirely. I blame myself. I take full responsibility for my actions.

I can't sit here—you did hear things about my mother. I couldn't sit here and blame my mother for anything. I mean, true, she did things that maybe everybody else thinks is wrong, but there's other people like yesterday you had my sister testified; she turned out fine. I can't blame anyone but I can only myself and my responsibility that I took in this, my drinking problems that I took whenever I constantly did anything I could to drink.

I want to make it clear also that I have no anger towards any of you jury members. You did exactly what you were asked to do. You sat there and listened and weighed the

evidence like you were told and then you come up with a fair decision. I also wanted it to be known that I have no anger towards Davis Ruark or Sam Vincent, who are only doing the job that they support to uphold.

In the decision I know that the Atkinsons are going to seek closure, and in a way I don't know that they can ever get closure in any decision that's made. Bill Cosby I have a article that he wrote that said—and the loss of his son, any time you bring—lose somebody you bring into this world there will never be any closure. I have never really got gotten over the loss of my twins. And regrettably no matter what you decide I'm sure that none of the Atkinsons will ever have complete closure either. For this I am truly sorry. Thank you for your time.

In *Harris v. State*, 306 Md. 344, 509 A.2d 120 (1986) we noted that "the allocutory process provides a unique opportunity for the defendant himself to face the sentencing body, without subjecting himself to cross-examination, and to explain in his own words the circumstances of the crime and his feelings regarding his conduct, culpability, and sentencing." *Harris*, at 358, 509 A.2d at 127. The sentencing authority may consider the content of the defendant's allocution in determining the existence of mitigating factors. *See Harris v. State*, 312 Md. 225, 254, 539 A.2d 637, 651 (1988)(finding that the trial court improperly instructed the jury that it was "to decide the case only on...evidence").

In the instant case, the trial judge instructed the jury with regard to mitigating circumstances as follows:

In Section IV each of you must determine for yourself whether any mitigating circumstances exist in this case. For the purpose of this sentencing proceeding a mitigating circumstance is anything about the Defendant or about the facts of the case that in fairness or in mercy may make the death sentence an inappropriate penalty for this Defendant... This procedure that I have just outlined in broad form is to make certain that each of you gives individual consideration to any mitigating circumstance you personally

find. Let me say that again because that's important—that each of you gives individual consideration to any mitigating circumstances you personally find as well as to any mitigating circumstance that all of you unanimously find.

\* \* \* \* \*

In determining whether any mitigating circumstances exist, consider all the evidence presented regardless of who introduced it. Mitigating circumstances must be proven but need not be proven beyond a reasonable doubt. A mitigating circumstance need only be proven by a preponderance of the evidence.

\* \* \* \* \*

[Section] 8(a) should contain every mitigating circumstance other than the other seven that all of you unanimously find to exist by a preponderance of the evidence. In 8(b) record every mitigating circumstance that at least one but not all of you find have been proven by a preponderance of the evidence. Any factor that you wish causes you to feel sympathy or mercy toward the Defendant may be considered by you to be a mitigating factor so long as such factor is considered by you to be within the framework of the verdict sheet.

Appellant asserts that the references to evidence in the judge's instructions regarding mitigating factors combined with the judge's statement prior to the allocution that the "evidentiary portion" of the sentencing proceeding had concluded may have mislead the jurors into thinking that they could only consider facts gleaned from the evidentiary portion of the sentencing phase and trial in weighing mitigating factors, and not, for example, the appellant's allocution. Appellant also questions the trial judge's instruction that mitigating factors may be considered so long as the jury found it "to be within the framework of the verdict sheet." Because the language of Section IV of the sentencing form states, "Based upon the evidence, we make the following determinations as to

mitigating circumstances," appellant argues that the jury did not give proper weight to his allocution.

In considering the appropriateness of sentencing instructions, we have stated: "[A]ttention should not be focused on a particular portion lifted out of context, but rather its adequacy is determined by viewing it as a whole." *State v. Foster*, 263 Md. 388, 397, 283 A.2d 411, 415 (1971), *cert. denied*, 406 U.S. 908, 92 S.Ct. 1616, 31 L.Ed.2d 818 (1972). While there is no constitutionally prescribed method of instructing a jury, we have stated, "It is sufficient from a constitutional standpoint if it is clear from the entire charge considered in context that a reasonable jury could not have misunderstood the meaning and function of mitigating circumstances." *State v. Calhoun*, 306 Md. 692, 741, 511 A.2d 461, 486 (1986), *cert. denied*, 480 U.S. 910, 107 S.Ct. 1339, 94 L.Ed.2d 528 (1987)(quoting *Peek v. Kemp*, 784 F.2d 1479, 1494 (11th Cir.1986), *cert. denied*, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986)).

Read as a whole, we find that the sentencing instructions urged the jury to consider all of the facts, evidence and circumstances concerning the appellant that may have been mitigating factors, including mitigating factors not listed on the sentencing form. Appellant urged the inclusion of the sentencing instruction for mitigating factors using the language "within the framework of the verdict sheet," and the trial judge gave the requested instruction. We have previously stated that "[d]efendants, including those in death penalty cases, will ordinarily not be permitted to 'sandbag' trial judges by expressly, or even tacitly, agreeing to a proposed procedure and then seeking reversal when the judge employs that procedure; nor will they freely be allowed to assert one position at trial and another, inconsistent position on appeal." *Burch v. State*, 346 Md. 253, 289, 696 A.2d 443, 461, *cert. denied*, 522 U.S. 1001, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997). The fact that Section IV of the sentencing form uses the language "[b]ased upon the evidence," pursuant to Rule 4–343, does not impermissibly limit the sentencing authority's consid-

eration of mitigating factors to items formally received by the court as evidence in either the trial or sentencing phases. The trial judge may use the word "evidence" in instructing the jury as to mitigating circumstances. The trial judge correctly instructed the jury that the standard of proof for determining the existence of mitigating circumstances was by a preponderance of the evidence. *See* Code, Art. 27, § 413(g).

Furthermore, an examination of the completed sentencing form refutes appellant's argument. Part 8(b) of Section IV allowed the jury to write in any mitigating factors found by at least one, but fewer than all twelve jurors. *See* Code, Art. 27, § 413(g)(8). Under this provision of the sentencing form, the jury listed "chaotic, disruptive, and violent childhood[;] accepts full responsibility for act and shows remorse[;] life imprisonment without parole is sufficient[;] mercy shown to defendant." The jury's finding of these mitigating factors indicates that the jurors considered the substance of the allocution, as it was the only opportunity appellant took to address the jury. We considered these same issues in *Conyers v. State*, 354 Md. 132, 729 A.2d 910, *cert. denied*, 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999), where we found that, "[t]he thoroughness of the trial judge's instructions effectively precluded a juror from not considering a factor he or she perceived as mitigating because it was not 'raised by the evidence.'" *Conyers*, 354 Md. at 173, 729 A.2d at 932. Thus, we find no error in the trial judge's instructions or in the sentencing form warranting reversal of appellant's death sentence.

## VII. REFUSAL TO INSTRUCT JURY THAT IT MUST FIND, AS A NON STATUTORY MITIGATING CIRCUMSTANCE, THAT APPELLANT WAS ACQUITTED OF PREMEDITATED MURDER

██ Pursuant to dicta in *Brooks v. State*, 104 Md.App. 203, 228, 655 A.2d 1311, 1323 (1995), *cert. denied*, 339 Md. 641, 664 A.2d 885 (1995), appellant requested the following instruction at the sentencing phase of the trial:

In your deliberations in the guilt-innocence phase of this trial you determined that Jody Miles was not guilty of premeditated murder. That finding is a mitigating factor which must be listed under No. 8, and must be weighed and considered by you in reaching a determination of sentence.

The trial court declined to give the requested instruction mandating the finding of a mitigating factor, and instead focused the jury's attention on the issue of acquittal for premeditated murder as a potential mitigating factor by providing the following instruction:

Also, in connection with this eighth category, which is, again, involves mitigating circumstances which you find in addition to the seven which you must consider there, you should give careful consideration to whether or not the circumstances surrounding the murder of Mr. Atkinson in light of your finding of lack of premeditation constitute mitigating circumstances.

If all of you find that the circumstances surrounding the death of Mr. Atkinson constitute mitigating circumstances, record such circumstance in 8(a) or record such circumstance in 8(b) if at least one but not all of you find it has been proven—that has been proven beyond—or by a preponderance of the evidence. Now, that is not—that is a direction for you to consider since you found there was no premeditation whether there were other mitigating circumstances or circumstances which you believe to have been mitigating in the murder of Mr. Atkinson.

At the conclusion of the sentencing instructions, appellant excepted to the instructions based on the trial court's refusal to instruct the jury that it must find the acquittal of premeditated murder as a mitigating factor. The trial court responded as follows:

I think that the question is squarely pitched to the jury. I think that's what *Brooks* means. I, for one, would be loathed to tell the jury either that it must—The Court must not reach a mitigating conclusion because I think that to me is of the essence of allowing the jury to do it. It's the

essence of the sentencing function. So, I will respectfully overrule the objection.

 As noted, in *Brooks,* the Court of Special Appeals's comments regarding the mandatory inclusion of a nonstatutory mitigating factor in a sentencing determination was dicta, as the issue of mitigating factors under the Maryland sentencing scheme had not been raised before the court. *See Brooks,* 104 Md.App. at 229, 655 A.2d at 1323 (explaining that "[a]s we noted at the outset, appellant has not been sentenced to death, and the imposition of the death penalty under the particular circumstances of her case is not at issue"). The trial court cannot mandate that a jury find a mitigating factor under Section 413(g)(8). *See Johnson v. State,* 303 Md. 487, 518, 495 A.2d 1, 17 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986)(explaining that requiring a jury to find a mitigating factor as a matter of law "would obliterate the jury's discretion under the provision and jettison the clear legislative intent"). The mandatory mitigating factors which must be considered under the sentencing scheme in capital cases are those set forth in Section 413(g)(1)-(7). Any other facts, evidence, or circumstances urged by appellant to be mitigating circumstances under Section 413(g)(8) have not been deemed mandatory mitigating factors by the Legislature. Permissive mitigating factors are defined solely by the sentencing authority, whether it is a jury or judge, in exercising its judgment and may be included on the sentencing form pursuant to Section 413(g)(8). *See Lockett v. Ohio,* 438 U.S. 586, 608, 98 S.Ct. 2954, 2967, 57 L.Ed.2d 973, 992 (1978)(holding in order to meet the constitutional requirements of the Eighth and Fourteenth Amendments of the United States Constitution, "a death penalty statute must not preclude consideration of relevant mitigating factors"); *Bowers v. State,* 306 Md. 120, 150, 507 A.2d 1072, 1087, *cert. denied,* 479 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986)(explaining that "[t]he intention is, as we see it, simply that the jury may itself set forth any facts not listed on the submitted form which it believes constitute a mitigating factor").

■■■ We have explained that in death penalty cases where the appellant asserts that the sentencing authority failed to consider or find mitigating factors, "the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational sentencing authority could have concluded that the accused failed to prove the claimed mitigating circumstance by a preponderance of the evidence." *See Stebbing v. State,* 299 Md. 331, 362, 473 A.2d 903, 918 (1984), *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984)(emphasis in original). In the matter now before us, the trial judge, when he gave the instructions concerning the sentencing form, directed the jury's attention to the fact that they had acquitted appellant of premeditated murder. The jury was well aware of the fact that appellant had been acquitted of premeditated murder, as the same jury heard both the merits phase and the sentencing phase of the trial. Because the mitigating circumstance of acquittal of premeditated murder is permissive, rather than mandatory, it is well within the realm of possibility that a reasonable sentencing authority could conclude that although the prosecution did not prove its case for premeditated murder at trial, the accused nevertheless committed murder by violently taking the life of another human being without provocation. The sentencing form requires the jury to balance the aggravating and mitigating factors it finds, and in so doing, the jury may exercise the conscience of the community in affording greater weight to the criminal conduct. Accordingly, we find no error in the trial court's refusal to issue appellant's requested jury instruction, and no prejudice to appellant in the jury's consideration of aggravating and mitigating circumstances absent the requested instruction.

VIII. WHETHER THERE ARE AMBIGUITIES AND IN-CONSISTENCIES IN THE SENTENCING VER-DICTS REQUIRING APPELLANT'S DEATH SEN-TENCE TO BE VACATED

■■■ Appellant argues that the combination of the contents of the third jury note, the trial judge's response to the note,

and the inclusion of the statement "[l]ife imprisonment without parole is sufficient" under Section IV, part 8(b) of the sentencing form demonstrates that the jury arbitrarily imposed a sentence of death in this case, requiring that the sentence be vacated. The facts of this case place appellant's criminal conduct within the framework of Maryland's capital punishment statute. His conviction for the first-degree murder of Edward Atkinson was based on the felony murder rule. *See* Code, Art. 27, § 410 (1957, 1996 Repl.Vol.).[18] At trial, the jury determined that appellant was a principal in the first-degree in the murder. The aggravating factor found by the jury in its sentencing deliberations was that appellant committed the murder while he was robbing Mr. Atkinson. *See* Code, Art. 27, § 413(d).[19] With regard to mitigating circumstances, the

18. Article 27, § 410 provides:

All murder which shall be committed in the perpetration of, or attempt to perpetrate, any rape in any degree, sexual offense in the first or second degree, sodomy, mayhem, robbery, carjacking or armed carjacking, burglary in the first, second, or third degree, kidnapping as defined in §§ 337 and 338 of this article, or in the escape or attempt to escape from the Maryland Penitentiary, the house of correction, the Baltimore City Detention Center, or from any jail or penal institution in any of the counties of this State, shall be murder in the first degree.

19. The aggravating factors set forth in Code, Art. 27, § 413(d) are as follows:

(1) The victim was a law enforcement officer who was murdered while in the performance of his duties;

(2) The defendant committed the murder at a time when he was confined in any correctional institution;

(3) The defendant committed the murder in furtherance of an escape or an attempt to escape from or evade the lawful custody, arrest, or detention of or by an officer or guard of a correctional institution or by a law enforcement officer;

(4) The victim was taken or attempted to be taken in the course of a kidnapping or abduction or an attempt to kidnap or abduct;

(5) The victim was a child abducted in violation of § 2 of this article;

(6) The defendant committed the murder pursuant to an agreement or contract for remuneration or the promise of remuneration to commit the murder;

(7) The defendant engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration;

jury unanimously found that appellant had not previously committed a crime of violence. *See* § 413(g)(1). Under Section IV, part 8(b), some of the jurors listed four additional mitigating circumstances: "chaotic, disruptive, and violent childhood[;] accepts full responsibility for act and shows remorse[;] life imprisonment without parole is sufficient[;] mercy shown to defendant." The jury unanimously voted to impose a death sentence.

We have held the felony murder rule embodied in Section 413(d)(10) to be a constitutional aggravating factor. *See Metheny v. State,* 359 Md. 576, 615, 755 A.2d 1088, 1109 (2000); *Calhoun v. State,* 297 Md. at 629, 468 A.2d at 77. Not all crimes defined as felonies under the Maryland Code are included within those offenses enumerated under the felony murder statute. *See* Code, Art. 27, § 410. The felony murders qualifying as an aggravating factor pursuant to Section 413(d)(10) are a select group derived from Section 410, thus narrowly restricting the class of death-eligible felony murders to those felonies deemed most serious by the Legislature, and to those convicted as principals in the first-degree. *See Calhoun,* 297 Md. at 625–626, 468 A.2d at 75. Thus, reading all relevant portions of the statute, the death penalty may only be imposed in Maryland in a narrow class of cases. *See id.* at 624, 468 A.2d at 74.

The circumstances surrounding the murder of Edward Atkinson fall within that narrow class of criminal activity eligible for the death penalty under Maryland law. In capital cases, the Maryland sentencing scheme requires the jury to carefully weigh the aggravating and mitigating circumstances such that a death sentence shall only be imposed where a unanimous

---

(8) At the time of the murder, the defendant was under sentence of death or imprisonment for life;

(9) The defendant committed more than one offense of murder in the first degree arising out of the same incident;

(10) The defendant committed the murder while committing or attempting to commit a carjacking, armed carjacking, robbery, arson in the first degree, rape or sexual offense in the first degree.

jury finds that the aggravating circumstances outweigh the mitigating circumstances. *See* Code, Art. 27, § 413(h), (i). The statute contemplates a weighing of the gravity of the aggravating and mitigating circumstances, not merely a numerical tally of whether the mitigating circumstances listed on the sentencing form outnumber the aggravating circumstances. *See Thanos v. State,* 330 Md. 77, 83, 622 A.2d 727, 729–730 (1993)(affirming imposition of a death sentence where the trial court found the existence of a single aggravating factor under Section 413(d)(10) outweighed the mitigating circumstance of Section 413(g)(4) that defendant could not appreciate the criminality of his conduct due to mental incapacity and five additional mitigating circumstances under Section 413(g)(8)); *Stebbing v. State,* 299 Md. 331, 473 A.2d 903 (affirming death sentence and finding that sentencing authority was not required to find statutory mitigating circumstances despite defendant's age at time of crime (19), extensive proof of defendant's history of substance abuse, mental illness and other cognitive impairment, and defendant's apology and promise that she would never do anything again which would result in her imprisonment). The record before us supports the jury's conclusion that the statutory aggravating circumstance in Section 413(d)(10), the "defendant committed the murder while committing...a robbery ..." outweighed the mitigating circumstances. Thus, we do not find any ambiguities or inconsistencies in the sentencing verdict.

## IX. JUROR STRIKES FOR CAUSE

Appellant contends that four potential jurors were excluded from the venire panel in violation of his Sixth and Fourteenth Amendment rights under the principles established in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), and Article 21 of the Maryland Declaration of Rights.[20] We disagree.

---

**20.** Article 21 provides as follows:

■ The trial court conducted voir dire from February 23–26, 1997, and excused four potential jurors from the panel. Appellant asserts that none of the four potential jurors had clearly demonstrated through their answers to questioning from counsel and the court that their views on the death penalty would prevent or substantially impair their ability to serve as jurors. We review the trial court's dismissal of the potential jurors for an abuse of discretion.

■ Appellant argues that Fatima Johnson should not have been stricken for cause because she never indicated she would be unable to impose the death penalty. Relevant portions of Ms. Johnson's voir dire are as follows:

The Court: Now, have you formed or do you have any general attitude about the death penalty or about capital punishment?

Juror: No, I haven't formed anything, but well—I don't know if I could sentence anybody to death. I don't know if I could. Depends on what the outcome is going to be. I don't know.

\* \* \*

The Court: Suppose that you heard the testimony about what the penalty should be—that is, you heard background about the defendant, and other testimony as to what the penalty should be, you heard the instructions from the judge, you heard from the lawyers arguing both sides of it, you got back and you talked with the other jurors and then, in you[r] own mind, you felt the death penalty was proper and allowed by law, would you be able then to vote for it?

_____

That in all criminal prosecutions, every man hath a right to be informed of the accusation against him; to have a copy of the Indictment, or charge, in due time (if required) to prepare for his defence; to be allowed counsel; to be confronted with the witnesses against him; to have process for his witnesses; to examine the witnesses for and against him on oath; and to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty.

Maryland Code, Constitutions Article (1958, 1981 Repl.Vol.).

Juror: I don't know. I really don't know.

\* \* \*

The State: Do you have any particular religious or moral convictions about the death penalty?

Juror: No. I just don't feel in my heart I could do it to anybody.

The State: Are there any circumstances under which you could impose the death penalty?

Juror: Only circumstances I could do it if somebody had did it to my family, my child, my husband. But I wouldn't want that case, so, like I said, I don't know, until I hear what really went on.

\* \* \*

Defense:—are your feelings such that it would in any way affect your ability to be fair and impartial in determining guilt or innocence?

Juror: I could be fair.

Defense: You know, with regard to the question of the death penalty, do you have a totally closed mind to being persuaded by either side as to whether the sentence should be death or life—we know it's going to be hard, but the question is do you have a closed mind—

Juror: No, it's not closed, but I don't know if I could say I want someone killed. I mean, you know, I don't know if I could.

\* \* \*

The State: If I could ask one follow up. The judge is going to tell you what the law is and you will determine what the facts are. Would you be able to follow the law that the judge instructs you, on the law that the judge says is the law in the State of Maryland?

Juror: Yes, I think I could.

The State: Even if it included the possibility of imposition of the death penalty.

Juror: I don't know.

■■■ Appellant also seeks reversal on the basis of the voir dire responses provided by Michael Diffendal, on the basis of alleged ambiguities in Mr. Diffendal's responses to questioning:

The Court: So you don't know whether you would be able to, based upon what you heard and the instructions of the judge as to your responsibilities with respect to the law, if you concluded that the death penalty was proper, you do not know whether would even then be able to—

Juror: I don't know, at this point.

The Court:—vote for it? I'm not asking you whether you thought you could find it was proper, but if you did find it was proper, you are not sure—

Juror: I'm not sure.

The State: As the judge indicated, he would instruct you or tell you what the law was, and you would listen to the facts and determine what the facts were. Please correct me if I'm wrong, the impression I got from your last answer is regardless of what the judge instructed you as to the law, that you may [ ] not be in a position to vote for the death penalty?

Juror: I guess what I'm saying right now is that I don't know when it came down to the final making a decision, whether I could or not. I have never really considered it in detail. It's a big responsibility.

\* \* \*

Defense: Sir, just to follow up a little bit more, obviously this is all in a vacuum, and it's difficult for anyone who has to make that kind of a decision. Can you conceive of any case where the State could convince you that the facts were so bad and the individual was so bad and he deserved the death penalty, you could vote for it?

Juror: I think that could be a possibility, depending on what the evidence was, but I can't sit here and say it would be, and it's something of great responsibility, and something I've never had to consider prior to this.

 Appellant also asserts error with regard to the responses of potential juror Katherine Bishop on the basis that the following responses in voir dire did not indicate that she would be unable to vote for a sentence of death:

The Court: If you were convinced at the end of that proceeding or persuaded that under the law as the judge had given it to you and under the facts which you heard at the original trial with regard to guilt or innocence, the portion of the trial that had to do with the penalty, that the death penalty was proper, could you vote for it?

Juror: Whew. I honestly don't know if I could. That is as close as I can get for you. I can't give you a yes or no. I don't make decisions like that, and I can only say that—I am not sure.

* * *

Juror: Are you asking me if I could vote for the death penalty?

The Court: Yes.

Juror: Not the three choices just the death penalty?

The Court: Yes.

Juror: I am not sure I could. I am not a big what if, person. That is my honest answer.

The Court: Again I am making it easy for you. I'm telling you that you have concluded that it would be proper—

Juror: What are you asking me?

The Court:—could you vote for the death penalty?

Juror: Not as it stands now.

* * *

Defense: When you say not as it stands now can you explain that?

Juror: I am a person that I can't live through your experience, I have to hear what is going on and he's asking me what if and I am not a good what if person. Things could change. I guess I am saying if I heard the evidence and thought maybe this would be appropriate, maybe I could. But I just can't—I'm not a blanket person. I don't see things in black and white, I wish I did it would make my life easier.

Defense: Sure. Obviously it's very difficult for anyone. At a sentencing proceeding, evidence will be presented and jurors may disagree. And I know you're not a good what if person, but do you see that there could be a set of circumstances where the State could convince you that the case was bad enough and the facts were bad enough that you could vote for death?

Juror: Not based on what I feel now, probably not.

Defense: And that would be based on what set of feelings if I might ask?

Juror: I just don't think anyone has the right, individual or government, to take somebody else's life. But as I said I have never been personally challenged, nobody's ever hurt anyone in my immediate family. I could change my convictions probably like that (indicating by snapping fingers).

Defense: Are you open to be persuaded by the State or completely closed to persuasion?

Juror: I'm always open.

▮▮▮ Appellant also argues that the responses of potential juror Tina Buttner do not indicate an inability to apply the law. The relevant portions of her voir dire are as follows:

The Court: The next question I have is have you formed any opinions for or against the death penalty?

Juror: Not yet. I don't think I'm old enough to make that kind of a decision, just yet...

* * *

The Court: . . . So you hear all this, you hear the evidence about what the penalty should be, you hear the judge's instructions, you hear the argument of the lawyers and then you go in the jury room and discuss the matter with the other jurors and during all that, you become convinced that in this case, the made up case, that the death penalty would be proper. Would you be able to vote for it?

Juror: Oh, gee. Oh, gosh. That is very hard. That is a hard decision.

The Court: Well it is a hard decision.

Juror: Um, I don't know. I probably couldn't do that. I probably couldn't. I think I would be—I don't know. I don't know. I think I might have—I don't know. I guess I have that regard for human life, I don't think I could just—

The Court: You don't think you could be persuaded to do that?

Juror: No, I don't think I could.

* * *

Defense: Can you conceive of any set of facts where the State could convince you the individual perpetrating the crime was bad enough and the crime itself was bad enough that you could vote for the death penalty?

Juror: I don't know. I think I probably—it would be really really hard for me to say that I would want the death penalty for anybody, regardless of the crime that they committed. Unless of course it's a mass murder or something. Intentionally killing hundreds of people. Serial killers I could probably vote for the death penalty.

 Under Maryland law and the United States Constitution, appellant was entitled to a fair and impartial jury. *See Ware v. State,* 360 Md. 650, 666, 759 A.2d 764, 772 (2000), *cert. denied,* 531 U.S. 1115, 121 S.Ct. 864, 148 L.Ed.2d 776 (2001);

*Evans v. State,* 333 Md. 660, 668, 637 A.2d 117, 121, *cert. denied,* 513 U.S. 833, 115 S.Ct. 109, 130 L.Ed.2d 56 (1994); *Couser v. State,* 282 Md. 125, 138, 383 A.2d 389, 396, *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 156 (1978). The standard for exclusion as a juror is that "a [potential] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 420, 105 S.Ct. 844, 850, 83 L.Ed.2d 841, 849 (1985)(quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 584 (1980)); *see Ware,* 360 Md. at 666, 759 A.2d at 772; *see also King v. State,* 287 Md. 530, 535, 414 A.2d 909, 912 (1980); *Grossfeld v. Braverman,* 203 Md. 498, 501, 101 A.2d 824, 825 (1954); *Adams v. State,* 200 Md. 133, 141, 88 A.2d 556, 560 (1952); *Lockhart v. State,* 145 Md. 602, 615–16, 125 A. 829, 833–34 (1924).

▇▇▇▇▇ The decision to excuse a potential juror for cause is left to the sound discretion of the trial judge and will not be disturbed on appeal except for an abuse of discretion. *See Ware,* 360 Md. at 666, 759 A.2d at 772. The trial court is in the best position to assess potential jurors and strike them from the panel if needed by taking into consideration the potential jurors' demeanors and credibility. *See id.* In capital punishment cases, the trial court must consider the potential juror bias arising from venire panel members who possess strong beliefs concerning imposition of the death penalty. *See Lockhart v. McCree,* 476 U.S. 162, 173, 106 S.Ct. 1758, 1764, 90 L.Ed.2d 137, 147 (1986)(holding that "the Constitution does not prohibit the States from 'death qualifying' juries in capital cases"); *Witherspoon v. Illinois,* 391 U.S. at 522–23, 88 S.Ct. at 1777, 20 L.Ed.2d at 785; *Evans,* 333 Md. at 668, 637 A.2d at 121; *Grandison,* 305 Md. at 724–25, 506 A.2d at 599–600.

In the instant case, each one of the four potential jurors indicated varying levels of inability or unwillingness to consider the death penalty as an appropriate sentence. As he excused each of these potential jurors, the trial judge com-

mented on his perception of the jurors. With Ms. Johnson, the trial judge was "particularly persuaded by the fact that she indicates that however she feels, her decision does not involve anything that the Court will tell her." The trial judge found that Mr. Diffendal could not say what he would do even when given the opportunity to conjure up the most extreme situation, such that he indicated that he would not be able to follow the judge's instructions. Ms. Bishop, though indicating at the conclusion of questioning that she was "always open," in the court's impression did so simply "to indicate her lack of total intransigence." Ms. Buttner could only tentatively qualify her willingness to accept the death penalty as an appropriate punishment for "mass murder," regardless of the requirements of the law. Furthermore, the trial judge observed Ms. Buttner's nervousness throughout questioning, as she gritted her teeth so much that the trial judge queried as to what was the matter with her. For the reasons indicated, we find no abuse of discretion of the trial judge in striking these four potential jurors for cause.

## X. THE APPELLANT IN SHACKLES:

During the second day of trial on March 10, 1998, appellant was transported to the courtroom for the afternoon session wearing leg and arm shackles. In order to reach the courtroom from the hallway, the appellant had to walk by the jury room where the door inadvertently remained open a few inches. Appellant alleged that he was observed by some of the jurors. Appellant moved for a mistrial, although he did not request that the jurors be polled to determine if any of them had actually seen appellant walking down the hallway in shackles. The trial judge denied the motion for mistrial.

We have stated that, "a defendant is entitled to an individualized evaluation of both the need for shackling and the potential prejudice therefrom." *Whittlesey v. State,* 340 Md. 30, 85, 665 A.2d 223, 250 (1995), *cert. denied,* 516 U.S. 1148, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996)(citing *Hunt v. State,* 321 Md. 387, 583 A.2d 218 (1990)). We review the trial

judge's denial of the motion for mistrial for an abuse of discretion. The general rule that a mistrial should be granted only for "manifest necessity" is well settled. *See State v. Crutchfield*, 318 Md. 200, 207–08, 567 A.2d 449, 452–53 (1989), *cert. denied*, 495 U.S. 905, 110 S.Ct. 1926, 109 L.Ed.2d 289 (1990)(quoting *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824)). Because the trial judge "is ordinarily in a uniquely superior position to gauge the potential for prejudice in a particular case," the trial judge is afforded broad discretion in determining the appropriateness of granting the motion for mistrial. *Watters v. State*, 328 Md. 38, 50, 612 A.2d 1288, 1294 (1992), *cert. denied*, 507 U.S. 1024, 113 S.Ct. 1832, 123 L.Ed.2d 460 (1993). For the reasons set forth below, no manifest necessity existed in this case.

The decision as to the method and extent of courtroom security is left to the sound discretion of the trial judge. *See Whittlesey*, 340 Md. at 84, 665 A.2d at 249. This discretion extends to the hallways and corridors leading to and from the courtroom, as the structure of the courthouse and the security available in the building may bear on the trial judge's decision to utilize shackles on the accused. On review we must ask "whether the measures utilized were reasonable and whether, given the need, such security posed an unacceptable risk of prejudice to the defendant." *Bruce v. State*, 318 Md. 706, 721, 569 A.2d 1254, 1262 (1990), *aff'd*, 328 Md. 594, 616 A.2d 392 (1992), *cert. denied*, 508 U.S. 963, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993)(citing *Holbrook v. Flynn*, 475 U.S. 560, 572, 106 S.Ct. 1340, 1347, 89 L.Ed.2d 525, 536–37 (1986)).

The Queen Anne's County Courthouse, constructed more than two hundred years ago, presents particular difficulties in obscuring shackled prisoners from public view. The prisoner transport vehicles must park on the public street such that all prisoners must be walked across the Courthouse square and enter the building through the front (and only) door to the Courthouse. The trial judge explained the inherent difficulties of the Queen Anne's County Courthouse in his denial of appellant's motion for mistrial:

I simply do not feel that one fleeting glimpse, in the meantime, for the past two days, and at the hearing, when each of the jurors was here when we had the public selection of the jurors and when each juror was interviewed privately, the defendant has been there really indistinguishable from the rest of us...and he has been here and he's been walking back and forth in this courtroom unshackled to the numerous-and not inordinate, I don't mean that when I say numerous, but there have been a number of conferences here at the bench and he is really pretty free to go. I have had occasion to look and I was—I have been very impressed over the years and I was again yesterday, at how really good the detention people are in making themselves obscure...we don't even know how many, if any of the jurors saw the defendant. But if they did, the only thing that he had on was a pair of leg irons, which are designed to keep someone from fleeing, when they're in transit.

\* \* \*

But, I don't think that when—first of all, they know that he is on trial for first degree murder. They know that he is in some sort of custody, and they cannot be so naïve as to assume that he is being transported back and forth on the outside on the honor system, because it just isn't that way. If they are, they're some jurors, but I simply cannot believe that they were. I think it was a most unfortunate event and it was unnecessary I think, frankly, but I think it was a—its magnitude was so small, it was a star, light years away in present significance, and—A, and B, any other significance or any other thing, it just—because you see, the example that I gave you before of a juror coming back from lunch and they happen to be coming back from lunch at the same time that they're bringing the defendant from the detention center, I cannot avoid that. There is no way possible to avoid that because there is only one way for any human being to get to the second floor courtroom, and it goes for jurors, it goes for guards, it goes for judges, it goes for everybody else. There is just no other way. Unless one

comes up the fire escape and I have never really seen anyone on the fire escape. It's outside. Besides, the window isn't even double hung and we have never been able to get it up, so heaven help us if we have a fire.

\* \* \*

[W]hen one comes up the stairs, the single stairway to the second floor, one is in the hall, and that hallway runs virtually the entire width of the building. To one's left is about one quarter of that long hall, at the end of which is a door, which takes up the entire end on the left, which is the door to the judge's secretaries office. If one turns to the right, at the very end of that hall, again, there is a door, taking up the entire area of the end of the hall, which is the door to the jury room. And then, right adjacent to that door is the door to come into the courtroom that the people from the detention center bring the defendant in, in that door, to the courtroom, and then through a portion of the courtroom to the—another room, which is the detention room where his transportation accessories are removed, and this would include over coats, rain coats, hats or whatever one is traveling with, and it just so happens that a very necessary traveling accessory of a prisoner is leg irons and hand cuffs, and why is that, it's to protect everybody and make sure that the person doesn't escape. It isn't a question of whether I think that Mr. Miles is going to escape, but, it's just—most of us are taught over the centuries that we don't deal in promises, so I really think that while unfortunate, the situation is absolutely diminimus and I'm glad the jury didn't hear it, because it's inconceivable to me that a juror thought anything about it. Frankly I think if they had seen the defendant walking around the hall, with nothing on they would have been astonished, and so, as I said, the detention center people are extremely careful when they are in the courtroom to be themselves unobtrusive, and, since I have been here, at least, the rule has been that we don't have hand cuffs and leg irons in the courtroom,

unless they have called me in advance and said there is a strong reason for it, that someone it violent."

Thus, the trial judge balanced the need to have basic security in shackling appellant while being transported to and from the courtroom while preserving the appellant's right to a fair trial and sentencing by having all shackles removed in the courtroom.

Appellant misplaces his reliance on *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)(discussing the constitutionality of binding and gagging a disruptive defendant in the courtroom during his trial), and *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (discussing the presence of uniformed state police troopers sitting behind defendants for security purposes). Both *Allen* and *Flynn* involved events taking place inside the courtroom, while the jury was present. In the present case, no extraordinary security measures were taken. At all times during the trial and sentencing the appellant wore ordinary clothing and appeared before the jury in the courtroom unshackled.

As we stated in *Bruce v. State*, "[t]his one inadvertent viewing of Appellant in handcuffs...did not result in any prejudice to defendant's right to a fair trial." 318 Md. at 721, 569 A.2d at 1262. Because the jury was never polled to determine whether there was actual prejudice, and there are no facts on the record which indicate an unacceptable risk of prejudice to the appellant in using shackles during prisoner transport, we decline to infer that the jurors who may have witnessed appellant walk down the hall, if any, were biased against the appellant and therefore, find no abuse of discretion.

*JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.*

Dissenting Opinion by RAKER, J., in which BELL, C.J. and ELDRIDGE, J., join.

I respectfully dissent. I would reverse appellant's convictions for first degree felony murder, robbery with a deadly

weapon, robbery, and use of a handgun in the commission of a crime of violence.

The Circuit Court erred in refusing to suppress all of the evidence that was derived from appellant's unlawfully intercepted cellular telephone communication in violation of the exclusionary command contained in the Maryland Wiretapping and Electronic Surveillance Act, Maryland Code (1957, 1998 Repl.Vol., 2000 Supp.) § 10–405 of the Courts and Judicial Proceedings Article.[1] Specifically, the State failed to carry its burden to prove that the evidence obtained from Jona Miles, appellant's wife, and appellant's subsequent statement to police were sufficiently purged of the taint of the primary illegality of the wiretap and the evidence seized pursuant to the search warrant derived therefrom that they did not constitute "fruit of the poisonous tree" under the attenuation doctrine of *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and its progeny.

The Circuit Court suppressed the tape recording of the phone conversation between Jona and Jody Lee Miles because it was seized illegally in violation of the Maryland wiretapping statute, § 10–401, *et seq.* No one disputes this finding of the trial judge. The judge also found, and the State also does not dispute, that the evidence seized pursuant to the search warrant executed on April 22, 1997 was unlawfully seized because it was derivative of the illegal wiretap and, thus, was excluded pursuant to the exclusionary mandate of § 10–405. Therefore, the sole question presented by this appeal, with respect to appellant's pretrial motion to suppress, is whether the remaining evidence obtained subsequent to the illegal wiretap and search warrant was admitted improperly in evidence at appellant's trial because it was derived from the illegally intercepted communication in violation of the exclusionary command of § 10–405.

---

1. Unless otherwise indicated, all statutory references are to Maryland Code (1957, 1998 Repl.Vol., 2000 Supp.), Courts and Judicial Proceedings Article.

While the statutory exclusionary rule of § 10–405 is not dependent upon the Fourth Amendment exclusionary rule of *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the constitutional "fruit of the poisonous tree" doctrine is helpful in interpreting the scope of the exclusionary prohibition against admission of evidence "derived from" an illegal wiretap. *See* maj. op. at 516–520; *United States v. Spagnuolo*, 549 F.2d 705, 711–12 (9th Cir.1977) (interpreting the federal wiretap statute as codifying the "fruit of the poisonous tree" doctrine with respect to its exclusionary provision); *United States v. Wac*, 498 F.2d 1227, 1232 (6th Cir.1974) (interpreting the words "derived therefrom" in the federal wiretap statute as a codification of the "fruit of the poisonous tree" doctrine); *Carter v. State*, 274 Md. 411, 422, 337 A.2d 415, 422 (1975) (applying the *Wong Sun* doctrine to a violation of the Maryland wiretap statute). As a result, the exclusionary rule "applies to any 'fruits' of a constitutional violation—whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention." *United States v. Crews*, 445 U.S. 463, 470, 100 S.Ct. 1244, 1249, 63 L.Ed.2d 537 (1980) (footnotes omitted).

It is black letter law that once a defendant has demonstrated the existence of a primary illegality, such as the illegal wiretap in this case, the burden shifts to the government to prove that the resulting evidence was not derived from that illegality. *See Alderman v. United States*, 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1969); *United States v. Parker*, 722 F.2d 179, 184 (5th Cir.1983); *United States v. Taheri*, 648 F.2d 598, 601 (9th Cir.1981); *United States v. Cella*, 568 F.2d 1266, 1284–85 (9th Cir.1978); *State v. Pau'u*, 72 Haw. 505, 824 P.2d 833, 836 (1992); *Carter*, 274 Md. at 443, 337 at 434, 337 A.2d 415; *Commonwealth v. Cephas*, 447 Pa. 500, 291 A.2d 106, 110 n. 4 (1972); *Hart v. Commonwealth*, 221 Va. 283, 269 S.E.2d 806, 809 (1980). As this Court stated in *Carter*:

Although initially the petitioner must go forward with evidence to show that the facts in the affidavit were obtained as "fruits of the poisonous tree," if it is established that any such illegal wire tap or eavesdrop was employed, it then becomes the ultimate burden of the prosecution to show that such facts were discovered independently, untainted by any such illegal wire tap or eavesdropping, or were so "attenuated as to dissipate the taint" of the primary illegality.

*Carter,* 274 Md. at 443, 337 A.2d at 434.

The government can demonstrate that the taint of the primary illegality has been purged in three ways: (1) by demonstrating that the causal nexus between the illegality and the subsequently discovered evidence is sufficiently attenuated so that the taint has been dissipated, *see Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. at 417, 9 L.Ed.2d 441, (2) by demonstrating that the subsequently discovered evidence was obtained from a source independent of the primary illegality, *see United States v. Wade,* 388 U.S. 218, 242, 87 S.Ct. 1926, 1940, 18 L.Ed.2d 1149 (1967); or (3) by demonstrating that, absent the illegality, the State still inevitably would have discovered the later evidence. *See Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984); *United States v. Ramirez–Sandoval,* 872 F.2d 1392, 1396 (9th Cir.1989); *Parker,* 722 F.2d at 184. In this case, neither the State nor the majority alleges an independent source for the disputed evidence or inevitable discovery; therefore, the admissibility of the evidence obtained from Jona Miles and appellant's confession is dependent solely upon application of the attenuation doctrine.[2]

---

**2.** The majority seems to flirt with either independent source or inevitable discovery analysis, without explicitly doing so, by arguing that the police had other investigatory leads directing them to appellant, *see* maj. op. at 536–537, and by describing Jona Miles's cooperation as voluntary assistance. *See id.* at 527–530. Nonetheless, the State has failed to meet its burden of demonstrating either that the evidence used to convict appellant was derived from a source independent of the primary illegality in this case or that the evidence used at appellant's

This Court examined the attenuation doctrine in the context of the Fourth Amendment in *Ferguson v. State*, 301 Md. 542, 483 A.2d 1255 (1984). In that case, the police had illegally arrested the petitioner without probable cause. As a result, at the petitioner's ensuing trial, the court suppressed the physical evidence seized from his person at the time of his arrest, but the trial court permitted the victim's identification of the petitioner, both at the time of his arrest and in court, to be admitted in evidence, and the petitioner was subsequently convicted of armed robbery and related offenses. *See id.* at 546–47, 483 A.2d at 1257.

This Court reversed the petitioner's conviction, ruling that the trial court had erred in not suppressing the extrajudicial identification testimony as the fruit of the petitioner's unlawful arrest, *see id.* at 552, 483 A.2d at 1260, although it upheld the court's admission of the in-court identification of the petitioner because it had an "independent source." *See id.* at 556, 483 A.2d at 1262. We found that the causal relationship between the illegal arrest and the subsequent extrajudicial identification of the petitioner was not sufficiently attenuated, primarily on the basis of the temporal proximity between the arrest and the identification, the lack of any meaningful intervening circumstance to break the causal connection, and the purposefulness of the police conduct in conducting the identification "showup." *See id.* at 550–52, 483 A.2d at 1259–60.

In examining the *Wong Sun* attenuation doctrine, courts repeatedly utilize consequential language, such as "exploitation," "direct result," "chain of events," "link," "nexus," "impetus," "connection," "causation," "inducement," "basis," and "product" to describe the necessary relationship between a primary illegality and evidence derived therefrom. In assess-

---

trial would have been discovered absent the illegally taped telephone conversation and subsequent search warrant. The majority's allegation that "the police had already physically identified their suspect," *id.* at 526 n. 11, merely because they had a physical description of a person who had been seen near the crime scene during the police investigation, is a far cry from the proof necessary to make the derivative evidence resulting from the illegal seizures in this case admissible.

ing attenuation, courts examine the facts and circumstances of each case in considering four factors: the giving of *Miranda* warnings; the temporal proximity of the illegality to the confession; the presence of intervening circumstances; and the purpose and flagrancy of the illegal police conduct. *See Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975); *Parker,* 722 F.2d at 186; *Ferguson,* 301 Md. at 549, 483 A.2d at 1258; *State v. Jennings,* 461 A.2d 361, 368 (R.I.1983).

In my view, there was no sufficient attenuation to purge the primary taint of the illegal oral acquisition. All of the subsequent evidence presented at the trial was the product of the primary illegality, and the State failed to satisfy its burden to prove attenuation. While Jona Miles and appellant both were given their *Miranda* warnings, an application of the remaining *Brown* factors makes clear that the temporal proximity between the illegal wiretap and search warrant and the derivative evidence, the lack of intervening circumstances, and the purposefulness of the illegal police conduct all strongly indicate a direct causal nexus between the illegally seized evidence and the subsequent evidence used by the State at trial.

The illegal wiretap and subsequent search and seizure led the police almost immediately to appellant—the police identified the voices of Jona Miles and appellant on the basis of the taped conversation; the search and seizure warrant for appellant's residence was issued within a week of the taped phone conversation having been turned over to the police, on the basis of the contents of that conversation; Jona Miles's custodial interview was conducted the same day, during which she consented to subsequent searches and seizures and described to police where she had disposed of the murder weapon; appellant was arrested later that evening and confessed after a brief custodial interrogation during which he was confronted with evidence that the police had against him, including the illegally seized evidence; and the police recovered the gun the following day.

Without the primary illegality, it is unlikely that the police would have identified appellant. There certainly were no intervening circumstances to lead them to his door.[3] The police knew or, at the very least, they should have known, that the tape of appellant's telephone conversation was obtained in violation of the statute and should not have exploited it further to obtain the search warrant for his residence.

Emphasizing the deterrent purposes of the exclusionary rule, the majority asserts that the police conduct in this case did not constitute flagrant and purposeful misconduct. *See* maj. op. at 538, stating that "the police did exactly what anyone would have expected them to do." I disagree. The intercepted conversation plainly was obtained in contravention of the wiretap statute. As the majority concedes, "the police were aware that the conversation had been taped . . . without the consent of the parties to the conversation." Maj. op. at 512. Even if, for some reason not apparent on this record, the police did not know that its further use was illegal, they certainly should have. The law in Maryland is certainly clear that the use of the contents of an unlawfully taped conversation is, in itself, an unlawful act. *See* § 10–402(a).

The majority attempts to distinguish the police misconduct in this case from that in *Brown, see id.,* but the attempt amounts to a distinction without a difference. In *Brown,* the Court found the police conduct to be purposeful and flagrant because the arrest of the petitioner was obviously improper and investigatory in purpose since it was used to effectuate a search of his home as a search incident to his arrest. *See*

---

**3.** The majority accuses this dissent of verging "on a traditional tort analysis of proximate cause. . . ." Maj. op. at 538. We agree that the attenuation doctrine does not require a strict but—for test of causation. Nonetheless, in determining the admissibility of derivative evidence under the Maryland wiretap statute, courts are guided by the statutory exclusionary command that no evidence "derived from" any intercepted communication may be received in evidence. *See* § 10–405. Under the attenuation doctrine developed in Fourth Amendment jurisprudence, the question of whether evidence *derives from* an illegally intercepted transmission is a question of *causation.* *See* discussion *supra* pp. 503– 505.

*Brown,* 422 U.S. at 604–05, 95 S.Ct. at 2262, 45 L.Ed.2d 416. The police conduct in this case is directly comparable—the police listened to an obviously illegally taped conversation and then used its contents to effectuate the search of appellant's home and seize evidence of his involvement in the murder. The only real difference between the two situations is that, in *Brown,* the police search was a warrantless one—a meaningless distinction for the purpose of assessing the purposefulness and flagrancy of the actions of the police.

In addition, the majority claims that construing the wiretap statute to preclude police use of the taped conversation in this case would produce an unreasonable result. *See* maj. op. at 539–540. On the contrary, such exclusion *is mandated* by this Court's holdings in *Mustafa v. State,* 323 Md. 65, 591 A.2d 481 (1991), and *Perry v. State,* 357 Md. 37, 741 A.2d 1162 (1999). In implicitly creating, despite its protestations to the contrary, *see* maj. op. at 538 n. 14, a new "clean hands" exception to the exclusionary rule of the Maryland wiretap statute, the majority appears to be overruling at least portions of *Mustafa* and *Perry sub silentio.*

*Mustafa* arose in a context similar to that of the case at bar, when a private citizen, who was not acting at the direction of law enforcement, turned over an intercepted conversation to police. *See Mustafa,* 323 Md. at 71, 591 A.2d at 484. Unlike this case, in which the interception was unquestionably illegal, the communication at issue in *Mustafa* was intercepted lawfully in Washington, D.C. Nonetheless, this Court held that wiretap evidence intercepted pursuant to more lenient statutory enactments of other jurisdictions is not admissible in Maryland courts unless it complies with Maryland's more restrictive standards. *See id.* at 74, 591 A.2d at 485. In doing so, we specifically held:

> The exclusionary provision § 10–405 of the Maryland Act precludes the admission of evidence which was not lawfully intercepted. The language of this section is unambiguous, and provides for no exceptions. There is no indication that the legislature intended to adopt anything but an "all-

encompassing exclusionary rule which it unequivocally fashioned in § 10–405."

*Id.* at 73–74, 591 A.2d at 485 (internal citations omitted).

In *Perry*, this Court held, *inter alia*, that there was no coconspirator exception, nor wilfulness requirement, to the exclusionary command of § 10–405. *See Perry*, 357 Md. at 60–67, 741 A.2d at 1174–78. In *Perry*, the telephone conversations that the State sought to introduce in evidence had been taped by one of the alleged participants in the crime and had been discovered and seized pursuant to a valid search warrant. *See id.* at 43, 741 A.2d at 1165. In fact, we specifically noted that "[t]here is no doubt that [the police officer] received the tape by an authorized means; he acquired it through execution of a search warrant, the validity of which is not in dispute. The question, then, is whether the interception ... was 'in accordance with the provisions of the subtitle.' " *Id.* at 63, 741 A.2d at 1176. Once again, this Court reiterated its strict interpretation of § 10–405 in *Mustafa*, emphasizing that "[a]ny exception that would make an interception lawful or that would preclude an aggrieved person from moving to suppress an unlawful interception must be 'specifically' provided for in the Act...." *Id.* at 62, 741 A.2d at 1175.

The analysis of the exclusionary provision in *Mustafa* and *Perry* applies with equal force to the evidence derived from an illegal wiretap in this case because § 10–405 places the contents of illegally intercepted communications on equal footing with evidence "derived therefrom." *See* § 10–405 ("Whenever any wire or oral communication has been intercepted, no part of the contents of the communication *and no evidence derived therefrom* may be received in evidence ....") (emphasis added).

The majority concludes that the "balance" of factors determining admissibility of the evidence falls in favor of the State. See maj. op. at 539–540. That determination, however, is a legislative one and not for this Court to make.

In enacting the strict exclusionary provisions of § 10–405, the General Assembly made the public policy determination of

the appropriate balance between the needs of law enforcement and the privacy interests of the citizens of Maryland in their wire communications. The Legislature did not choose to adopt the type of sliding scale exclusionary rule that the majority now espouses. As we explained in *Perry*, "[t]he Legislature has made unmistakably clear that, except as otherwise specifically provided in the subtitle, wire communications are not to be intercepted without the consent of all parties." *Perry*, 357 Md. at 65, 741 A.2d at 1177.[4] This is true because "[t]he exclusionary provision operates only upon the communication itself, depriving it of evidentiary value, rather than against the person or property of the interceptor." *Id.* at 66, 741 A.2d at 1177–78. Likewise, the fact that the police did not participate in the taping of the conversations at issue in this case is irrelevant to the question of whether their use of the illegally obtained recordings was permissible or whether evidence derived therefrom is admissible in a Maryland court.

The record of the suppression hearing in this case shows clearly that the State failed to carry its burden to prove attenuation. Unfortunately, the record from the suppression hearing contains only a few fragmentary excerpts of the illegally wiretapped conversation and the subsequent police interviews of Jona Miles and appellant, which makes it difficult to determine with any certainty the extent to which the primary illegality was exploited in obtaining this later evidence. Cf. maj. op. at 527 n. 12 (acknowledging fragmentary state of Jona Miles' statement in the record). Nonetheless, since the State bears the burden of proving attenuation, this paucity of evidence should not work to appellant's detriment.

---

4. In fact, the Maryland General Assembly acquiesced in this Court's broad interpretation of § 10–405 when it amended the enumerated offenses of § 10–402 and § 10–406 of the Maryland wiretap statute in 2000, after this Court's decisions in *Mustafa v. State*, 323 Md. 65, 591 A.2d 481 (1991), and *Perry v. State*, 357 Md. 37, 741 A.2d 1162 (1999), but did not amend the exclusionary provision of § 10–405. *See* 2000 Maryland Laws ch. 288, at 1690–91 (codified as amended at Maryland Code (1957, 1998 Repl.Vol., 2000 Supp.) §§ 10–402, 10–406 of the Courts and Judicial Proceedings Article).

Furthermore, the record before us contains evidence affirmatively demonstrating a substantial nexus between the illegal wiretap and resulting search of appellant's residence and the evidence obtained from Jona Miles and appellant.

It is important to remember that the analysis of whether evidence to which objection is made was obtained by exploitation of the primary illegality or instead by means sufficiently distinguishable to be purged of the primary taint depends primarily upon weighing the facts in the particular case. *See United States v. Finucan,* 708 F.2d 838, 843 (1st Cir.1983); 5 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 11.4 (3rd ed.1996). The excerpts from the police interview with Jona Miles, who was under arrest at the time as an accessory in the alleged crime, demonstrate that *police specifically used the contents of the wiretapped conversation in eliciting Ms. Miles's statements.* At different points in the interview, the police informed Ms. Miles that they knew that appellant had called her and told her to get rid of the gun, that she and appellant had talked about his resemblance to the composite photographs that had been broadcast on the local news, and that appellant had informed Ms. Miles that he was at a particular friend's house when the composites appeared on television, and the police made reference to another friend, "Becky," whose suspicions about the crime appellant and Ms. Miles had discussed during the wiretapped conversation.

During the police interview of Jona Miles, the following exchange occurred regarding the contents of the illegally taped conversation between appellant and Ms. Miles about disposing of the murder weapon and the composite photographs on television:

[POLICE]: The same night *he called and told you to get rid of the gun—*

JONA MILES: I saw—no. I saw him in the afternoon. I saw him on the noon news. I was at a patient's house.

[POLICE]: Okay. Was it the same day that *he talked to you that night and told you to get rid of the gun?* That you saw the composites?

JONA MILES: Probably.

[POLICE]: Okay, so probably on the 15th, which is the day before your doctor's appointment, you saw the composites?

JONA MILES: All I remember is it was on the noon news.

[POLICE]: Okay.

JONA MILES: I remember that.

[POLICE]: That night, *Jody called you, you two talked about the comparisons between him and the composites:*

JONA MILES: Uh-huh.

(emphasis added).

The police also interviewed Jona Miles using her cellular telephone conversation with appellant regarding the night that he saw the composites on television at a friend's house:

[POLICE]: The night the composites were shown on TV, *he told you he was at somebody's house.* Whose house was he at? *He said he didn't really want to look at the TV and act too interested.*

JONA MILES: Cooper's. Cooper's.

[POLICE]: Jimmy K. Cooper?

JONA MILES: Uh-huh.

(emphasis added).

Later on in the interrogation, police returned to the subject of appellant's telephone conversation with Jona Miles about the composites being shown on television:

[POLICE]: Okay. When you—why were you so worried and why were you so grateful that *Jody called you that night he called you after the composites were up? You said you were on pin and needles waiting for you [sic] to call because you were worried.*

JONA MILES: Just wondering if something happened to him.

(emphasis added).

During their illegally taped cellular telephone conversation, appellant and Jona Miles engaged in the following discussion:

FEMALE VOICE: Are you sure you're going to be okay down there:

MALE VOICE: I don't know. You know, I was almost thinking about having you call Becky and tell her to leave me a key somewhere.

FEMALE VOICE: That might not be a good idea.

MALE VOICE: Why?

FEMALE VOICE: Because she asked questions last night. If anything had come up. Yes, she did bring it up to me. You knew she would. I told you she would.

MALE VOICE: Did anything come up what?

FEMALE VOICE: Huh?

MALE VOICE: Anything come up what?

FEMALE VOICE: Remember what you told me you all talked about when I left?

MALE VOICE: Yeah.

FEMALE VOICE: Yeah. She just asked me about if you'd heard anything. I said no. Everything's cool. I said everything's fine, why? And she brought it up the other day.

The police also exploited this illegally obtained information during their interrogation of Jona Miles:

[POLICE]: Who is Becky? Who's Becky that's a friend of yours? [5]

MILES: Rebecca Chips.

The majority sidesteps the crucial causation analysis by pointing out that the police never confronted Jona with "the fact that they possessed the taped cellular phone conversation." Maj. op. at 528. This assertion, however, in no way negates the fact that the police confronted her with the *contents* of those tape recorded conversation. In that way,

---

5. Although the reference to "Becky" may seem to be innocuous, it is the effect of being confronted with the contents of the illegally taped telephone conversation that creates the sense of the futility of noncooperation in the suspect, independent of the incriminating nature of those contents.

Ms. Miles' statements to police were nonetheless *derived from* the taped conversations and, therefore, inadmissible under § 10–405.

Stressing that Ms. Miles voluntarily waived her *Miranda* rights, the majority asserts that any taint emanating from the illegal wiretap was attenuated in two ways. First, the majority states that the taint dissipated when Jona Miles attempted to dispose of the evidence of the crime. *See* maj. op. at 527–529. Second, the majority asserts that the taint dissipated at the point at which Ms. Miles "took the Maryland State Police on a guided tour of the locations where she had disposed of evidence." Id. at 527.

Courts have universally agreed that the giving of *Miranda* warnings *alone* cannot *per se* purge the taint of a prior illegality. *See Parker,* 722 F.2d at 186; *People v. Hines,* 195 Colo. 71, 575 P.2d 414, 416 (1978); *State v. Abdouch,* 230 Neb. 929, 434 N.W.2d 317, 328 (1989); *State v. Jennings,* 461 A.2d 361, 368–69 (R.I.1983); *Hart,* 269 S.E.2d at 809; *State v. Williams,* 162 W.Va. 309, 249 S.E.2d 758, 764 (1978). The voluntary waiver of *Miranda* rights is but one factor to be considered in assessing attenuation. In fact, the Court's specific holding in *Brown,* upon which the majority relies for its finding of attenuation, was that *Miranda* warnings issued for the purposes of protecting a suspect's Fifth Amendment rights are not sufficient, in themselves, to purge the taint of a Fourth Amendment violation. *See Brown,* 422 U.S. at 603, 95 S.Ct. at 2261, 45 L.Ed.2d 416.

Furthermore, *Brown* dealt with a situation where the petitioner's statements to police had been tainted by his illegal arrest. In deciding that question, the Supreme Court devoted a significant portion of the opinion to discussing the distinction between taint analysis under *Wong Sun* and the Fourth Amendment and voluntariness under *Miranda* and the Fifth Amendment. *See Brown,* 422 U.S. at 597–99, 95 S.Ct. at 2258–59, 45 L.Ed.2d 416.

The majority here makes the same mistake as the Illinois state courts did in *Brown*—conflating the question of the

voluntariness of appellant's statement with the question of whether that statement was the result of prior illegal police conduct.[6] If anything, the causal connection between a suspect's statement and illegal police conduct will be stronger when the prior police conduct is an illegal search and seizure, rather than an illegal arrest, because of the inherent pressure to confess generated by a suspect's being confronted with tangible evidence that is the result of the illegal search. *See* discussion and cases cited *infra* pp. 591–596. Any assessment of the voluntariness of the actions of Jona Miles or appellant must take place against the backdrop of their having been confronted with the fruits of the illegally recorded phone conversation and search and seizure resulting therefrom.

The majority also asserts that Jona Miles' actions in disposing of evidence after the taped phone conversation and in leading the police to the locations of the destroyed evidence somehow attenuated the connection between her statements and the illegally wiretapped conversation. *See* maj. op. at 527–529. This assertion is opaque, at best, and simply begs the question of *why* Jona Miles made statements to police and led them to the inculpatory evidence. Jona Miles' conduct was *the result of* being confronted with the evidence that the police had obtained from the illegally wiretapped conversation. Her attempts to dispose of evidence of the crime, if anything, demonstrate that, had it not been for the illegally obtained telephone conversation that led the police to her, she never would have come forward on her own and cooperated with the investigation, particularly given her own criminal liability as an accessory. Not only does her disposal of evidence not fulfill the State's burden to prove attenuation of the causal link between the illegal wiretap and subsequently obtained evi-

---

6. In fact, the majority notes that the police did not coerce Ms. Miles, offer her leniency, or compel her to lead them to evidence. *See* maj. op. at 527. These questions, while crucial to determining whether her statement was voluntary under the Fifth Amendment, are insufficient to establish attenuation of the violation of her statutory privacy rights under the Maryland wiretap statute.

dence, it effectively rebuts it.[7] Ultimately, the majority concludes that Ms. Miles' actions following her statements to the police manifested the "uniquely human attributes of perception, memory and volition," which were sufficient to purge her confession of the taint of the primary illegality. *Id.* at 526. I fail to see how those characteristics have any bearing on attenuation in that they are utterly irrelevant to the question of whether her statements were the result of the illegally recorded conversation.

We turn next to appellant's statement to police. The majority stresses that the police never *showed* any of the illegally-seized evidence gathered prior to Jona Miles's arrest in questioning appellant. *See id.* at 535. Nonetheless, the question is not whether the police visually paraded the evidence in front of appellant, but whether they *used it* during questioning in order to obtain his confession, which they did when they discussed the evidence with him. The majority asserts that "[t]he police never disclosed in questioning appellant the contents of the cellular phone conversation, nor the fact that Jona Miles had given them a statement." *Id.* The mere fact that the police did not disclose to appellant the *existence* of the illegal wiretap does not mean that his confession was not derived therefrom pursuant to § 10–405. During the interrogation, the police confronted appellant with evidence that they seized as a result of the illegal wiretap and subsequent search of appellant's residence, a fact that even the majority does not

---

7. Attempting to dispute the claim that the record excerpts establish that Ms. Miles' conduct was the result of being confronted with the illegally obtained evidence, the majority points out that the excerpts of the taped phone conversation contain no references to the Structure store at the Dover Mall, the murder weapon, or the Choptank River, "all of which were facts that came to be know to the police through their independent investigation." Maj. op. at 529. Again, the majority here appears to be engaging in independent source analysis without explicitly stating so. More importantly, for the purpose of attenuation doctrine, the police, in fact, did *not* come to discover the murder weapon in the Choptank River through "independent investigation," but rather *solely* as the result of Ms. Miles' statements to them. Were it not for the illegally wiretapped conversation and the subsequent use thereof by police, there would have been no evidence linking appellant to the murder in this case.

deny. The trial court ruled that the search of appellant's residence was illegal, as the warrant was based on the illegal wiretap, and the State did not appeal that ruling.

The excerpts of the police interrogation of appellant demonstrate that the police informed appellant specifically that they had seized the clothes that he purchased with the victim's Structure credit card (pursuant to the tainted search warrant) and that they had recovered the gun from the river and more clothing from a dumpster (as a result of Jona Miles' statements, which themselves are derivative of the illegal wiretap):

[POLICE]: We've done a search warrant on your house today. We've recovered Structure pants, Structure jeans, Structure shirt that was hidden in Larry's closet. Okay?

MILES: You're going to find Structure clothes in -

[POLICE]: I'm not going to find this brand new Structure shirt that was hid in Larry's closet. That belongs to you. We've recovered a gun from right down here in the river, a little 22 with a long barrel on it. Okay? We've recovered clothes from a dumpster right down on 404. So, we're not in here playing games. You're a smart person; I'm a smart person. But, I'm here to tell you there's a reason why everything happens. Okay? What I'm here to ask you is for you to tell us why things happen. I know you killed Edward Joseph Atkinson. Okay, I'm not going to let you sit here and play dumb with you and let you play dumb with me. We're adult men, it's time to find out why. I'm not interested in sending you to prison for the rest of your life but I want to know why you killed this man.

The majority attempts to minimize this disclosure by stressing again that the police did not *show* the seized clothing to appellant. *See* maj. op. at 535. I simply fail to fathom how informing appellant that they had seized the damning evidence from his home is any more attenuated from the illegal search and seizure than actually placing it in front of him, nor am I aware of cases from any jurisdiction that recognize this distinction.

The majority also attempts to minimize the impact of the disclosure by pointing out that, although the clothing was illegally obtained, the police already had receipts from the Structure store itemizing the clothing that had been purchased with the victim's credit card. *See id.* at 535–536. This is precisely why the seized evidence, with which police confronted appellant, was so damning. The items seized from appellant's home, in conjunction with the receipts that the police already had from the Structure store, directly inculpated appellant in the crime. Clearly, any admissions by appellant, in light of this illegally obtained evidence, were not sufficiently attenuated to be purged of the taint of the primary illegality.

During the interrogation of appellant, the police also referred to his being at the house of certain of his friends when the composite photographs were displayed on the news and to who was present at the time, information specifically obtained from the wiretapped conversation between appellant and Jona Miles. The following conversation transpired between appellant and Jona Miles during their taped cellular telephone call:

MALE VOICE: There's a mess of cops up here.

FEMALE VOICE: Over where?

MALE VOICE: On the other side of Denton. But, ah, you know, they sat right there, Jim and Kay, and had a face and a picture and looking right dead at it, you know, I was sitting right next to the television so it's like side by side.

FEMALE VOICE: Uh-huh.

MALE VOICE: And they said it looked like Richard, whoever Richard is. So, you know, it's sort of iffy.

During the police interrogation of appellant, the following exchange occurred:

MILES: I was at different people's houses. I lay a composite at these houses and I'd make sure I was there when the news hit. And—

[POLICE]: One of them being Jim McKay [sic]?

MILES: Yeah.

[POLICE]: Okay.

MILES: And I sat there and, you know, they sat right there and they said it looked like some other guy. They said (inaudible).

[POLICE]: Richard?

MILES: Yeah.

It is mindboggling how the majority can assert, given this factual record, that the statements of Jona Miles and appellant, as well as the physical evidence derived therefrom, are not the direct result of the illegally wiretapped conversation and the search executed on its basis.

The majority again appears to confuse derivative evidence attenuation analysis, under the Fourth Amendment and Maryland wiretap statute, and the question of voluntariness under the Fifth Amendment with respect to appellant's statements to police. The majority emphasizes that appellant's statement was voluntary and volitional based on his demeanor during the interrogation, the extent of his cooperation with the police, and his personal circumstances of age, knowledge and experience. *See* maj. op. at 536–538. As we explained *supra*, while voluntariness is *one* factor to be considered under *Brown*, it is hardly determinative of the question of whether appellant's statements were derived from the illegally recorded conversation and subsequent search of his residence—a question that, in my view, is not sufficiently dealt with in the majority opinion.

The chronology of events in this case is very similar to those reviewed by the Supreme Court of Nebraska in *Abdouch*. In that case, the defendant was convicted of manufacturing marijuana after the trial court had suppressed evidence from an illegal search of her residence but admitted her subsequent custodial statements after finding that they were freely and voluntarily made. *See Abdouch*, 434 N.W.2d at 321. The Nebraska Supreme Court reversed the defendant's conviction, finding that her statements to police were "fruit of the poisonous tree" of the illegal police search because the police had

detailed for her, during their interrogation, the evidence that was seized before the defendant admitted her participation in the marijuana production. *See id.* at 329. In doing so, the court emphasized the significant differences, for the purposes of the fruit of the poisonous tree doctrine, between a custodial statement resulting from an illegal arrest and one resulting from an illegal search, concluding that, when a suspect is confronted with evidence discovered during an illegal search, there has clearly been an exploitation of the primary illegality because, once the suspect has realized the evidence that the police have seized, that realization plays a significant role in encouraging him or her to confess by demonstrating the futility of remaining silent-because the suspect has, in effect, been "caught red-handed." *See id.* at 327–28.

Furthermore, the court made clear that, while giving *Miranda* warnings to a suspect is *a* factor to be considered in attenuation analysis, the warnings alone are not sufficient to break the causal chain between the illegality and subsequent confession, particularly where the primary illegality was an illegal search and seizure. The court noted that the warnings cannot neutralize the inducement to confess that is furnished by confronting the suspect with illegally obtained evidence that demonstrates guilt and the futility of remaining silent. *See id.* at 328; *cf. Pau'u,* 824 P.2d at 835–36 (holding that the government's burden to show that a confession is voluntary is particularly heavy when the defendant is under arrest and that the waiver is invalid if it is induced by a prior illegality).

The Supreme Court of Rhode Island reached a similar conclusion in *Jennings.* In that case, the defendant was convicted of manslaughter and possession of a firearm while committing a crime of violence, in part on the basis of a detailed confession that he made to police. *See Jennings,* 461 A.2d. at 363. The trial court had suppressed physical evidence taken during an illegal search of the defendant's apartment, but had admitted the defendant's subsequent confession that he gave after the police had confronted him with the illegally seized evidence. *See id.* at 364. The Supreme Court of Rhode Island reversed the defendant's conviction, finding

that his confession had been tainted by the exploitation of the illegal search of his dwelling. *See id.* at 368. The court held that the exclusionary rule applies "when the giving of a statement is induced by confronting a suspect with illegally seized evidence," unless the state can show attenuation. *See id.* The court also found that voluntariness was "merely a threshold requirement," *id.*, such that giving *Miranda* warnings alone "does not per se make any subsequent statement sufficiently a product of free will to break the causal connection between the confession and the unlawful action." *Id.* The court concluded:

> The record discloses that the confession was made immediately upon defendant's being confronted with the information that the police had possession of the gun as a result of an illegal search and seizure. There was no time lapse. There were no intervening events to break the causal chain other than the reading of the *Miranda* warnings, which does not per se purge the taint of the illegality. Additionally, the use of the product of the illegal police conduct to induce defendant to change his story has the quality of purposefulness which the Fourth Amendment seeks to protect against. A reading of the record reveals that the defendant's sudden willingness to incriminate himself was the result of his being confronted with the illegally seized evidence.
>
> We therefore find that the confession was obtained by the exploitation of the illegal search and seizure.

*Id.* at 369 (footnote omitted).

This case is also similar to *Williams,* in which the defendant was convicted of first degree murder after the trial court had denied his motion to suppress the victim's watch, which he alleged had been seized illegally, and all of his inculpatory statements made subsequent to that seizure. *See Williams,* 249 S.E.2d at 760. The Supreme Court of West Virginia reversed his conviction. After finding that the watch had been seized illegally, the court went on to rule that the defendant's confessions also should have been suppressed because they were induced by the illegally seized evidence.

*See id.* at 764. The court found that the defendant's first confession was made immediately after being confronted with the victim's watch and was, therefore, a product of the exploitation of the illegality. *See id.* The court then found that the prosecution had failed to meet its burden of showing that the defendant's subsequent confessions were not the product of the first. *See id.* The court concluded:

There is no evidence demonstrating a break in the causative link running between the confessions in this case. The State did not meet its burden, and we must presume each confession was the product of the preceding illegalities. The fact that *Miranda* warnings were given prior to each confession is not sufficient standing alone to purge the primary taint of the illegal search and seizure. Had the defendant also been informed that the victim's watch and his first confession could not be introduced at trial against him in the State's case in chief, a different outcome might obtain as to the subsequent confessions.

*Id.* (footnote omitted).

Also similar is *Commonwealth v. Johnson*, 474 Pa. 512, 379 A.2d 72 (1977), in which the Supreme Court of Pennsylvania found that a suspect's statement to police was derivative of an illegal search and should have been suppressed. In that case, the appellant was convicted of rape, conspiracy, and second degree murder after the trial court granted his motion to suppress certain evidence seized by police, but admitted his subsequent inculpatory statement. *See id.* at 73. The Pennsylvania Supreme Court found that, since the search of the appellant's house was illegal, his subsequent statement was inadmissible because the Commonwealth failed to establish that it was sufficiently purged of any taint from the unlawful activity. *See id.* The court found:

In this case, the typewritten statement used against appellant at trial was obtained as a direct result of the unlawful search. The police obtained the statement as a result of three factors: (1) appellant's arrest and the extended custodial interrogation which followed; (2) confrontation of appellant with the fact that evidence had been

obtained during the unlawful search of his house; and (3) confrontation of appellant with information obtained from [his coconspirator].

*Id.* at 76. The court held that the appellant's custody and arrest were the direct product of the illegal search because the police did not suspect the appellant until after the search was conducted and because evidence found in the illegal search formed the basis for probable cause to arrest him. *See id.* The court found that the appellant's incriminating statements were derivative of the illegal search because they were obtained after he was confronted with evidence found during the illegal search. *See id.* Finally, the court found that the appellant's statements were also derivative of the illegal search because they were made after he was confronted with information given to the police by his coconspirator, which in turn was the result of the illegal search. *See id.* at 77. Clearly, the same analysis applies almost verbatim to the case at bar. *Cf. United States v. Johns,* 891 F.2d 243, 245–46 (9th Cir.1989) (holding that attenuation is a question of the substantiality of the taint-if the role of the illegality is insubstantial, then suppression is inappropriate, but if the illegality is "the impetus for the chain of events" leading to the derivative evidence, then it is "too closely and inextricably linked to the discovery for the taint to have dissipated"); *United States v. Cales,* 493 F.2d 1215, 1215–16 (9th Cir.1974) (holding that derivative evidence must be suppressed if an illegal wiretap tended "significantly to direct the investigation toward the specific evidence sought to be suppressed"); *Amador–Gonzalez v. United States,* 391 F.2d 308, 318 (5th Cir.1968) (holding that the defendant's confession was the direct result of the illegal discovery of narcotics and that the taint of the illegally seized evidence had not been removed); *United States v. Schipani,* 289 F.Supp. 43, 62 (E.D.N.Y.1968), *aff'd,* 414 F.2d 1262 (2nd Cir.1969) ("If illegally secured information leads the government to substantially intensify an investigation, all evidence subsequently uncovered has automatically 'been come at by exploitation of that illegality.' The unlawful search has set in motion the chain of events leading to the government's

evidence."); *State v. Blair*, 691 S.W.2d 259, 263 (Mo.1985) (holding that the defendant's palm and finger prints and statements were properly suppressed because they resulted from an unlawful arrest and search).

The majority relies upon *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), as support for the proposition that the link between the illegal wiretap and the evidence obtained from Jona Miles and appellant was sufficiently attenuated. *See* maj. op. at 522–527. In fact, citing *Ceccolini*, the majority asserts that "the voluntariness of a person's actions in providing evidence or testimony should be considered as an intervening factor under the attenuation doctrine." *Id.* at 525. The majority's reliance on *Ceccolini* is misplaced. The Supreme Court in *Ceccolini* found that there was sufficient attenuation between an illegal search and the live testimony of a witness at trial, *see Ceccolini*, 435 U.S. at 273, 98 S.Ct. at 1058–59, 55 L.Ed.2d 268, but did so because it found that the evidence indicated "overwhelmingly that the testimony given by the witness was an act of her own free will in no way coerced or even induced by official authority" as a result of the illegal search. *Id.* at 279, 98 S.Ct. at 1062, 55 L.Ed.2d 268. Most significantly, in reaching that conclusion, the Court specifically emphasized that the illegally obtained evidence was not used in questioning the witness. Moreover, substantial periods of time elapsed between the time of the illegal search and the initial contact witness and the testimony at trial; the witness's identity and her relationship to the defendant were well known to the investigators prior to the illegal search; and the police did not conduct the illegal search and seizure with the intent of finding a witness to testify against the defendant. *See id.* at 279–80, 98 S.Ct. at 1062, 55 L.Ed.2d 268. Clearly, none of those factors outlined by the Supreme Court exist in this case.

Furthermore, *Ceccolini* deals with the application of the attenuation doctrine to live-witness testimony at trial. The exploitation of the illegal search in this case led the police not merely to the live-witness *testimony* of a particular witness, but to appellant's identity, the identity of an accessory (Jona

Miles), the murder weapon, and other physical evidence. In fact, the *Ceccolini* analysis is informed by the degree of free will exercised by the witness in testifying. The Supreme Court noted that "the greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means. Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet." *Ceccolini*, 435 U.S. at 276, 98 S.Ct. at 1060, 55 L.Ed.2d 268. The question of whether Jona Miles could have testified, had the trial judge suppressed all of the derivative evidence (including her statement to police), is the only question on which *Ceccolini* would shed light.

This rationale was shared by the United States Court of Appeals for the Ninth Circuit in *United States v. Ramirez–Sandoval*, 872 F.2d 1392, 1396 (9th Cir.1989). In that case, the United States District Court suppressed physical evidence and contemporary statements discovered as the result of an illegal search, but permitted witness testimony regarding identification of the defendants and their illegal immigration scheme pursuant to the inevitable discovery doctrine. *See id.* at 1394. Citing *Ceccolini*, the Court of Appeals ruled that the testimony should not have been admitted, either on the basis of the attenuation doctrine or inevitable discovery. *See id.* at 1396. With respect to attenuation, the court found that the testimony had been induced by the illegal search. *See id.* at 1397. The court distinguished *Ceccolini* as follows:

This case is unlike *Ceccolini*. First, the illegally obtained documentary evidence was clearly used by Officer Torres in questioning the witnesses. Second, no time elapsed between the illegal search and the initial questioning of the witnesses. Third, the identities of the witnesses were not known to those investigating the case. In all likelihood, the police and the INS would never have discovered these witnesses except for Torres' illegal search. Finally, although the testimony was voluntary in the sense that it was not coerced, it is not likely that these witnesses would have come forward of their own volition to inform officials that

they were illegally transported into the country by the appellant. It seems clear that their testimony was induced by official authority as a result of the illegal search.

*Id.*

Clearly, all four of the distinguishing factors identified by the Court of Appeals (use of the illegally obtained evidence in questioning, lack of time lapse, discovery of the identity of witnesses solely by means of the illegal search, and no independent reason to come forward) exist just as strongly in the case of Jona Miles's and appellant's statements to police. *See United States v. Rubalcava–Montoya*, 597 F.2d 140, 143 (9th Cir.1979) (holding that, under *Ceccolini*, since there was no evidence in the record that the prosecution witnesses made an independent decision to come forward and since they were discovered as a direct result of an illegal search, the government failed to rebut the logical inference that the search induced their testimony); *United States v. Marder*, 474 F.2d 1192, 1195 (5th Cir.1973) (holding that "if the identity of a government witness and his relationship to the defendant are revealed because of an illegal search and seizure, the testimony of such witness must be excluded" unless the government can show an independent source or attenuation, including the consideration of whether the witness would have come forward on her own); *United States v. Tane*, 329 F.2d 848, 853 (2nd Cir.1964) (holding that the grand jury testimony of the defendant's coconspirator was derivative of an illegal wiretap because the witness's identity was derived from the wiretap, the witness was unwilling to testify or inculpate himself until the wiretap conversation was revealed, and the government did not show attenuation sufficient to break the nexus between the tap and the testimony); *Cephas*, 291 A.2d at 111 ("The primary question ... is not whether the witness voluntarily plead guilty and testified, rather it is *why* she chose to do this.... [T]hese choices on her part flowed directly from the exploitation of the search and thus the taint remains.... For the police to conduct an illegal search during which they discover physical evidence and a witness ..., and for a court to suppress the physical evidence but not the witness would

seemingly be allowing the authorities to do indirectly what they cannot do directly.").

The State has failed to meet its burden of showing that the taint of the prior illegal wiretap and illegal search had been dissipated or that there was an independent source for the evidence. Accordingly, I would reverse the Circuit Court's denial of Petitioner's motion to suppress all of the evidence derived from the illegal wiretap of his cellular telephone conversation, including the evidence obtained from Jona Miles and appellant's statement to police.

Chief Judge BELL and Judge ELDRIDGE join in this dissenting opinion.